# Staunton

G. C. DAVIDSON *v.* COMMONWEALTH:

September 11, 1936.

Present, Campbell, C. J., and Holt, Hudgins,
Gregory, Browning and Eggleston, JJ.

452

The opinion states the case.

*S. B. Campbell* and *George P. Young*, for the plaintiff in error.

*Abram P. Staples, Attorney-General*, and *Joseph L. Kelly, Jr., Special Assistant Attorney-General*, for the Commonwealth.

CAMPBELL, C. J., delivered the opinion of the court.

This is a writ of error to a judgment of the Circuit Court of Wythe County, whereby the plaintiff in error was convicted of murder in the second degree and his punishment fixed at eighteen years in the penitentiary.

It is assigned as error that the trial court erred in giving and refusing instructions.

The court, on motion of the Commonwealth, gave ten instructions, and on motion of the defendant, gave seven instructions.

A careful consideration of the instructions convinces us that the jury was properly instructed and no error was committed by the trial court in that regard.

While it is true that in the argument of the case counsel for defendant relied upon the alleged errors relative to the granting and refusing of instructions, it was conceded that the main reliance of the defendant involved the refusal of the court below to set aside the verdict of the jury, on the ground that under the evidence in no event could the accused be guilty of any higher offense than voluntary manslaughter.

The accused, a strong, vigorous man, lived in that section of Wythe county known as Stony Point, a distance of eight miles from Wytheville, the county seat of Wythe county.

On the day of the homicide accused had been in Wytheville, and from testimony of witnesses for the Commonwealth and the accused, he was under the influence of liquor when he returned to his home. Leaving his home, accused was walking along what is called the Dodgion Road when he met his son-in-law, a man named Nelson, and Jessie Hurst, the deceased. Without any provocation, the accused applied to the two men that vilest of epithets which can be applied to a man. Nelson resented the insult and struck accused with his fist, knocking him to the ground. Hurst likewise resented the remark of accused and threatened to strike him, whereupon accused apologized to Hurst and said he only meant to tell him to "hold your horses."

After the difficulty accused went back to his home. In a short time thereafter he saw Nelson and Hurst approaching, and, as he states, in order to avoid a second difficulty, left his home and went to the filling station of one Mack Hedrick and requested Ed Hedrick, who was repairing a truck, to take him to Wytheville. While standing at the truck telling Hedrick of the prior difficulty, Hurst, with his two little boys, was seen approaching. Accused, when apprised of the approach of Hurst, remarked, "I reckon I can stand it." When Hurst arrived he again remonstrated with accused for having called him a vile name. Accused again apologized, but Hurst, who seemed to be slightly under the influence of liquor at the time, was not appeased and walked around the truck to where accused was standing, put his left hand on the shoulder of accused, "pecked" accused lightly on the nose and finally hit accused a violent blow in the face. The blow staggered accused and he caught the side of the truck, whether with one or both hands the evidence does not show. Immediately upon being struck accused said to Hurst, "You damn — — — — ," and began to strike Hurst, who, according to the evidence of the Commonwealth, began to retreat, followed by accused.

The further evidence of the Commonweath is that Hurst struck only one blow, that he made no further attempt to strike accused and that during his retreat of twenty feet the accused inflicted upon him eleven wounds described by Dr. C. D. Moore as follows:

"One stab on the right side between the fifth and sixth ribs, which entered the chest cavity. One stab on the left side between the sixth and seventh ribs which entered the chest cavity. Either of these wounds might have proved fatal. One stab on the left side between the seventh and eighth ribs; one stab on the left side between the fifth and sixth ribs. One stab in the left arm. One stab under the left shoulder blade. One stab on the right side of the small of the back, which was also cut. One stab just below this. Two shallow stabs in the back of the neck; and one deep stab in the angle of the left jaw. I did not probe this. It might or might not have proved fatal, depending upon whether a large artery was cut. The wounds in the back were not serious. There were eleven wounds, which were apparently stabs by knife in Hurst's body, six of which were in front of body and five in back part of body."

Immediately after the difficulty accused said to Mack Hedrick, "Here Mack, take my knife, I used it on him, and believe me, by God, I used it." Hedrick refused to take the knife and said to accused, "Did you cut that man?" and accused replied, "Yes and believe me, by God, I cut him."

There is not a scintilla of direct evidence that accused was suffering from "a transport of passion" by reason of the blow he received.

The evidence introduced by the defendant is to the effect that Hurst was fighting every step of the twenty feet; that after retreating that distance Hurst picked up two rocks, but before he could use them he fell to the ground; that at the time of his death Hurst had a rock in his hip pocket.

The testimony of the accused is an effort to set up a clear case of self-defense. This is shown by his statement that he was not thrown into a passion but was "addled" by the blow he received, and that while Hurst was trying to get something

out of his pocket he cut him, though he does not remember when he took the knife from his pocket.

In contradiction of the statement of accused that he procured the knife after he was struck, the three eye-witnesses stated that they observed no effort upon the part of the accused to get the knife from his pocket after being struck, but that accused returned the blow of Hurst immediately upon being struck. In rebuttal of the claim that accused was in danger of either real or apparent bodily harm, it was shown that while accused was a sturdily built man, Hurst was a small man, weighing only one hundred and thirty-three pounds.

The contention of counsel for accused is that "as a matter of law the action of the defendant in cutting the deceased must be attributed to passion and hot blood, and not to malice, so as to make the defendant guilty of no higher offense than voluntary manslaughter."

It is unquestionably true that before an accused can be convicted of murder it must be shown that in the commission of the deed he was actuated by malice, either express or implied. Express malice is evidenced when one person kills another with a sedate, deliberate mind and formed design. It is also evidenced where, upon a sudden provocation, one inflicts upon another a cruel and unusual punishment, so that he dies. Implied malice is evidenced by any deliberate, cruel act committed by one person against another, however sudden, as when a man kills another without any, or without great provocation; in other words, if the punishment inflicted for a slight transgression is in its nature out of all reason and beyond all proportion to the offense offered, then the inference of law is that the perpetrator was actuated by malice, and he loses the presumption that the act was done in a moment of human frailty.

While the law affords no protection for the commission of a homicide, save and except when the homicide is justifiable or excusable, yet, in tender consideration of human frailties, it does afford a means of escape from the imputation of murder

where it appears that the killing was done in the heat of passion.

The distinction between murder and voluntary manslaughter is marked. The test of murder is malice. The test of manslaughter is passion—passion engendered by great provocation.

"Passion arising from sufficient provocation is evidence of the absence of malice, and reduces homicide to manslaughter; but passion without provocation, or provocation without passion, is not entitled to this indulgence; and where there are both provocation and passion, the provocation must be sufficient." Davis's Criminal Law, page 83.

In *Jacobs v. Commonwealth*, 132 Va. 681, 688, 111 S. E. 90, 93, Kelly, P., said:

"In Minor's Synopsis of Criminal Law, page 46, it is said that the provocation, in order to extenuate homicide to manslaughter, must be such as to have 'actually excited strong passion, so as to have temporarily *unsettled the reason*. Adequate provocation and ungovernable passion must concur,' citing several Virginia cases."

In the principal case of *Read v. Commonwealth*, 22 Gratt. (63 Va.) 924, it is said:

"It is not only necessary in such a case and for such an effect that a reasonable provocation should be received, but it is also necessary that the provocation should have the effect of producing sudden passion under the influence of which alone the offense is committed. It must be a sudden transport of passion, which the law calls *furor brevis*. If a person, on receiving the gravest provocation, is unmoved by passion, but wantonly and willfully kills his adversary otherwise than in self-defense, he is guilty of murder. The law mitigates the offense to manslaughter, only as an indulgence to the infirmity of human nature. Provocation without passion or passion without provocation will not do; both must concur to reduce the offense to the grade of manslaughter."

The record, as we comprehend it, discloses the sole reliance of the accused to be upon his plea of self-defense. There is no effort upon the part of the accused to show that

the blow struck him by Hurst threw him into "a transport of passion." After Hurst had fallen to the ground, mortally wounded, the appearance and acts of the accused denoted that he was calm and collected. He offered his knife to Hedrick and requested that an officer of the law be called. His statement to the sheriff does not indicate that he was laboring under the strain of a great passion. No doubt he thought then, as he must have thought when upon trial, that he had the right to slay his adversary because he had been struck by him in the face with his fist. When faced with the alternative of seeking an acquittal on the ground of self-defense or admitting that he was guilty of voluntary manslaughter and amenable to the punishment prescribed by the statute, he elected to stand upon his plea of self-defense. The jury very properly repudiated his plea of self-defense. He was in no danger of great bodily harm by reason of the assault committed upon him by a small man weighing one hundred and thirty-three pounds. In reaching a conclusion on the degree of the offense, the jury had the right to compare the strength and size of the two men.

The principle stated by Judge Moncure in *Howell's Case*, 26 Gratt. (67 Va.) 995, 1003, is applicable in this case:

"In the first place, a circumstance which strikes us as very important in this case is the great disparity between the age and strength of the parties—the prisoner and the deceased. The prisoner was in the prime of life, about forty-five years old, and a strong and able-bodied man. The deceased was but fifteen years old, weighed about eighty-five pounds, was rather delicate in appearance, and was on his way to school, having come by the mill to bring his corn. The prisoner might, if he had chosen, have stamped the deceased to death with his feet, or beaten him to death with fists or with hands; though his offense in that case would doubtless have been none the less. But he chose to use a more certain and speedy means of death. He used a deadly weapon—one of the most deadly of all weapons, a hatchet or small chop axe. And he used it in such a way as to insure the death of the boy. He struck him, apparently with all

his strength, three blows on the head with the blade of that axe; thus inflicting three wounds on that most vital portion of the body, two of which were about three inches long and about two inches deep, and extending from near the upper part of the left ear toward the crown of the head. Could he have expected, or intended, to inflict such blows upon that boy without killing him? Was it strange that the boy lived but twenty-four hours after receiving them? Is it not more strange that he did not immediately die under the infliction? The law presumes that a sane man intends the natural consequence of his act. What consequence of this act of the prisoner could have been more natural than the death of the boy?"

See also, *Honesty's Case*, 81 Va. 283, 304.

When we consider the size of the accused and the deceased, the assault with the fist, the immediate counter-assault of the accused, armed with a knife, the retreat of the deceased, the advance of the accused, the infliction of eleven wounds (five of them in the back of deceased), the boast of the accused as to the efficiency of the wounds inflicted and the lack of evidence that the accused was in the throes of an irresistable passion, we are constrained to conclude that the jury dealt most leniently with him.

There is no error in the judgment of the trial court, and it is therefore affirmed.

*Affirmed.*