COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, Haley and Beales
Argued at Alexandria, Virginia


LARRY JOHNSON

                                                        OPINION BY
v.        Record No. 1955-07-4                  JUDGE JAMES W. HALEY, JR.
                                                     DECEMBER 16, 2008
COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF FAUQUIER COUNTY
                    Herman A. Whisenant, Jr., Judge Designate

             Cindy Leigh Decker (Law Offices of Mark R. Voss, on brief), for
             appellant.

             Eugene Murphy, Senior Assistant Attorney General (Robert F.
             McDonnell, Attorney General, on brief), for appellee.


                                  I.  INTRODUCTION

       Convicted by a jury of malicious wounding and obstruction of justice, Larry Johnson

maintains the circuit court erred:  (1) in failing to order an examination as to his competency;

(2) in refusing to reduce the charge of maliciously wounding Kevin Casey, a former Assistant

Commonwealth's Attorney, to assault and battery; and (3) in refusing to set aside the sentencing

verdict based upon his post-trial Brady motion that the Commonwealth had failed to disclose

evidence as to why Casey had resigned his position as an assistant.  We affirm.

                                  II.  BACKGROUND

       On October 16, 2006, Johnson was on trial on charges unrelated to this appeal.  Kevin

Casey was the prosecuting attorney.  After Johnson was found guilty and the trial ended, the

parties were preparing to leave the courtroom when Johnson rose and struck Casey once with a

closed fist on his left ear and the area behind his ear, causing Casey to fall.  Johnson's

momentum caused him to fall near Casey. Court personnel responded within seconds and removed Johnson from the courtroom. Casey rose, but lacked a sense of balance, causing him to fall against a table. Other persons seated Casey in a chair until a medical squad responded. Although he felt well when the squad arrived, he shortly told one of its members he was about to vomit or faint, at which point the medical squad member placed him on the ground and administered oxygen. Casey suffered a concussion, two cuts in his ear, one of which required four stitches, and soreness in his shoulder lasting for several weeks.

Johnson later manifested pride at his actions. Detective Mike Zeets heard Johnson declare "that if he saw Mr. Casey, he would do the same thing again." Corporal Jason Anns reported Johnson said: "Kevin Casey got what he deserved. It was a long time coming. . . . I would do it again." Anns further testified Johnson repeatedly said: "I got him good, didn't I?" Anns observed Johnson generally "seemed like he was proud of himself." Anns also heard Johnson threaten to harm Greg Ashwell, another prosecutor in Casey's office. Major Dale Mauck testified similarly. He testified Johnson affirmed: "I'm not sorry for what I've done, I'm proud of what I've done. . . . I did it for everybody he's wronged up in here."

A grand jury indicted Johnson on charges of maliciously wounding Casey and obstruction of justice.

During pre-trial motions on February 28, 2007, Johnson exhibited disruptive behavior stemming from his belief that the proceedings were biased against him. After the court denied a portion of one of defense counsel's motions, the following exchange occurred:

> [JOHNSON]: You're going to deny everything from this man, ain't you? Why don't you give somebody a fair trial? Man, let me out of here, Bradley.[1] Man, you know what? Man, I'm telling you, I'm baking a cake.
>
> [SECURITY]: Mr. Johnson.

---

[1] Johnson referred to the trial court as Bradley and Miller.

[JOHNSON]:  I'm baking a cake.

[SECURITY]:  Calm down, Mr. Johnson.

[JOHNSON]:  Hey, hey, hey, hey, Miller, I'm tired of this [expletive], man.  Every time I come --

[SECURITY]:  Sit down, Mr. Johnson.

[JOHNSON]:  -- down here, I'm getting railroaded.

[SECURITY]:  Mr. Johnson.

[JOHNSON]:  Get away from me, man.  Miller, let me out of here, please.  Miller, please, please.  Miller, I'm asking you.  Miller, you and me have got a good understanding.  I'm getting tired of these people down here.

Subsequently, defense counsel moved to withdraw from the case.  Counsel based the motion on the fact that Johnson had told him of an intent to harm people when taken to the court for trial and that counsel had disclosed this intent to the sheriff, after consulting the Bar concerning the propriety of disclosure.

The court held a hearing on this motion the day the trial was scheduled.  After hearing argument from counsel, the court inquired of Johnson whether he wished his counsel to withdraw.  Johnson indicated he wanted counsel to remain.  The court sought to confirm Johnson had this desire by asking if he "had the opportunity to discuss [the motion] with [counsel], you understand his motion, and it's your desire that he stays?"  Johnson responded affirmatively.  The court then denied the motion.

During this hearing, the court *sua sponte* raised the issue of whether to order a competency evaluation.  The court indicated it considered the issue because of what the charges involved, the previous disruptive behavior by Johnson in court, the motion to withdraw, and an unspecified event occurring while Johnson was in jail.  Defense counsel asked the court to order the evaluation.  Counsel stated:

I will tell Your Honor that whenever I've talked to Mr. Johnson, he gets very, very agitated. It's very difficult to speak with him about what's going on in the case. He can't stay on task very well and he -- Your Honor, he just -- he gets extremely agitated and then -- I don't know of a word to use, but he kind of rants, Your Honor.

I haven't brought a [competency exam] motion basically because of how I viewed the facts of this case and what our argument would be and with my previous discussions with Mr. Johnson. . . . I guess, in an abundance of caution, I would suggest that a [competency exam] motion would not be an unfrivolous motion . . . .

The court questioned Johnson about whether he wished to be evaluated, and Johnson responded: "No. I wish for the trial to go." In the end, the court declined to order a competency evaluation, stating it would "see how things go today, and then we'll proceed accordingly."

Johnson was tried by a jury on April 18, 2007. He remained calm throughout the guilt phase of the trial. At the conclusion of the evidence, defense counsel made a motion to strike the malicious wounding charge on the ground that the Commonwealth's evidence only proved assault and battery. The court denied the motion. The jury convicted Johnson of both charges.

The jury then heard evidence in the sentencing phase of the trial, including further testimony by Casey. Casey stated that as a result of this incident, he ceased enjoying his profession and found the risks of further such encounters outweighed his continued practice in prosecution. He resigned about a month after the incident. Asked on cross-examination whether other reasons existed for his resignation, Casey testified he "grew not to like the job."

Johnson disrupted the sentencing phase due to his belief in the unfairness of the proceedings. When defense counsel asked Casey whether he resigned because his office placed him on administrative leave and Casey responded in the negative, Johnson spoke:

[JOHNSON]: Huh? Man, that man got suspended, Your Honor.

[JUDGE]: I'm going to say it again, sir. Please be quiet.

- 4 -

[JOHNSON]: Come on, now, Miller, you can't stop me from talking.

[JUDGE]: -- or I'll have to remove you from the courtroom.

[JOHNSON]: He shouldn't lie. He shouldn't lie.

[JUDGE]: Ladies and gentlemen of the jury, please disregard what's going on at this time.

Any other questions?

[JOHNSON]: He got suspended. It wasn't because of me.

After the court gave Johnson a final warning, he temporarily became calm.

Johnson also testified during the sentencing phase. The testimony covers slightly under eight pages of transcript and represents a coherent dialogue between Johnson, counsel for both sides, and the court. Johnson testified he lived in Virginia his entire life, experienced a rough childhood, received mental health treatment while incarcerated, and had been on suicide watch several times in the past.

The jury recommended Johnson receive sentences of fifteen years on the malicious wounding charge and twelve months on the obstruction of justice charge.

Defense counsel subsequently filed a motion to set aside the sentencing portion of the jury's verdict, asserting the Commonwealth had impermissibly withheld exculpatory evidence. Counsel maintained that the same day Casey resigned as a prosecutor, a judge of the juvenile and domestic relations district court prohibited Casey from practicing in that court due to inappropriate conduct. Counsel also stated the Commonwealth's Attorney and another assistant prosecutor were present at the meeting. The defense argued that if the Commonwealth had provided this information, the jury likely would have imposed a lesser sentence.

The court heard argument on the motion to set aside the verdict at the beginning of the sentencing proceeding. Although defense counsel presented an argument consistent with his

motion, he did not produce any evidence to support it. The court denied the motion, finding that even if the alleged meeting did occur, it was speculation that it represented the reason for Casey's resignation. The court held the "motion is pure speculation that the reason [Casey] resigned was because he was banned from the juvenile court. There is no evidence to that. That's simply your argument under speculation here today." The court imposed the sentences fixed by the jury.

### III. ANALYSIS

A. <u>Whether the Circuit Court Erred in Declining to Order a Competency Evaluation</u>

Johnson first maintains the circuit court erred by failing to *sua sponte* order a competency exam after the court expressed doubts about Johnson's fitness for trial and by denying his motion for a competency exam, even though he never raised the issue before the court addressed it *sua sponte*. Johnson contends this violated his constitutional and statutory rights to not face trial while incompetent.

The Due Process Clause of the Fourteenth Amendment forbids the prosecution of incompetent persons. <u>Medina v. California</u>, 505 U.S. 437, 439 (1992). The constitutional test for competence "is whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" <u>Godinez v. Moran</u>, 509 U.S. 389, 396 (1993) (quoting <u>Dusky v. United States</u>, 362 U.S. 402, 402 (1960) (*per curiam*)). Competency issues may implicate "'both procedural and substantive due process.'" <u>Beck v. Angelone</u>, 261 F.3d 377, 387 (4th Cir. 2001); <u>see also</u> <u>Smith v. Mullin</u>, 379 F.3d 919, 930 (10th Cir. 2004).

- 6 -

A defendant makes a procedural due process claim when he argues "that the trial court failed to hold a competency hearing after the defendant's mental competency was put in issue."[2] Walton v. Angelone, 321 F.3d 442, 459 (4th Cir. 2003); see also United States v. Herrera, 481 F.3d 1266, 1271 (10th Cir. 2007). The defendant has the burden of showing a "'bona fide doubt'" concerning his competency. Beck, 261 F.3d at 387 (quoting Pate v. Robinson, 383 U.S. 375, 385 (1966)). The trial court should consider "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial . . . even one of these factors standing alone may, in some circumstances, be sufficient." Drope v. Missouri, 420 U.S. 162, 180 (1975). The necessary inquiry is factually intensive and case specific, for "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed [exist]; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." Id.

By contending the circuit court erred in failing to order a competency exam, Johnson raises a procedural due process argument.

The General Assembly has provided a framework for considering whether to order a competency evaluation in Code § 19.2-169.1(A). This section provides that if "there is probable cause to believe that the defendant . . . lacks substantial capacity to understand the proceedings

---

[2] On the other hand, a substantive due process claim maintains the defendant was incompetent when tried or sentenced. United States v. General, 278 F.3d 389, 396 (4th Cir. 2002); see also Vogt v. United States, 88 F.3d 587, 591 (8th Cir. 1996). Defendants raising this issue bear the burden of demonstrating their incompetence by a preponderance of the evidence, United States v. Robinson, 404 F.3d 850, 856 (4th Cir. 2005), and this Court reviews only for clear error by the trial court, Orndorff v. Commonwealth, 271 Va. 486, 500, 628 S.E.2d 344, 351 (2006). The defendant has a high burden, for "'the evidence must indicate a present inability to assist counsel or understand the charges.'" Burket v. Angelone, 208 F.3d 172, 192 (4th Cir. 2000) (quoting United States ex rel. Foster v. De Robertis, 741 F.2d 1007, 1012 (7th Cir. 1984)). Indeed, "neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." Medina v. Singletary, 59 F.3d 1095, 1107 (11th Cir. 1995).

against him or to assist his attorney in his own defense, the court shall order that a competency evaluation be performed." Code § 19.2-169.1(A). The Code reflects the constitutional guarantees of the Due Process Clause, described by courts above as necessitating only a "bona fide doubt" as to competency. See Orndorff v. Commonwealth, 271 Va. 486, 500, 628 S.E.2d 344, 351 (2006) (explaining Code § 19.2-169.1(E), which deals with the ultimate decision on whether a defendant is competent, in light of the constitutional standard enunciated by the United States Supreme Court in Godinez); see also Three S. Dev. Co. v. Santore, 474 A.2d 795, 796 (Conn. 1984) (equating probable cause with a bona fide confidence); cf. United States v. Respress, 9 F.3d 483, 487-88 (6th Cir. 1993) (describing probable cause as arising from "bona fide suspicions"). The requirement of probable cause "'relates to probabilities that are based upon the factual and practical considerations in everyday life as perceived by reasonable and prudent persons. The presence or absence of probable cause is not to be examined from the perspective of a legal technician.'" Parker v. Commonwealth, 255 Va. 96, 106, 496 S.E.2d 47, 53 (1998) (quoting Taylor v. Commonwealth, 222 Va. 816, 820, 284 S.E.2d 833, 836 (1981)). We review a circuit court's decision not to order a competency evaluation only for abuse of discretion. See Orndorff, 271 Va. at 500, 628 S.E.2d at 351.

In Smith v. Commonwealth, 48 Va. App. 521, 535-36, 633 S.E.2d 188, 195 (2006), we held the diligence of defense counsel in seeking an evaluation represents a key factor in reviewing a circuit court's decision not to order such an assessment. In Smith, nothing prior to the sentencing portion of the jury trial suggested the defendant lacked mental capacity. Id. at 535, 633 S.E.2d at 195. However, before the jury returned its sentencing verdicts, the defendant attempted to hang himself. Id. at 528, 633 S.E.2d at 191. Defense counsel then told the court this "raised a 'question' about the defendant's mental status." Id. at 533, 633 S.E.2d at 194. Counsel requested and received time to consult with the defendant and then made no further

- 8 -

argument.  Id.  We found it "entirely fair" to place great emphasis on counsel's actions, for "a trial judge's first instinct should be to determine if defense counsel appears to be aware of the potential problem.  Counsel is 'obviously in a superior position' to evaluate a client's ability to understand the proceedings."  Id. at 535-36, 633 S.E.2d at 195 (quoting United States v. Caicedo, 937 F.2d 1227, 1233 (7th Cir. 1991)).  Thus, the history of defense counsel's satisfaction with the client's mental health has persuasive weight in determining whether a court should order a competency evaluation.  Id. at 536, 633 S.E.2d at 195.

While the court should strongly consider representations by defense counsel, such statements, standing alone, do not typically provide probable cause for an evaluation.  "[T]he trial court may consider an express doubt by the accused's attorney, although such doubt alone is not enough to establish sufficient doubt."  Reynolds v. Norris, 86 F.3d 796, 800 (8th Cir. 1996); see also Bryson v. Ward, 187 F.3d 1193, 1202 (10th Cir. 1999).  In State v. DesLaurier, 646 A.2d 108, 116 (Conn. 1994), the court affirmed a denial of competency exam where "the defendant supported his motion exclusively with limited instances of prior 'irrational behavior' while meeting with his counsel, his apparent communication and comprehension difficulties during a pretrial conference on the prior day and the brevity of his responses during" questioning by the court.  In State v. Herrera, 33 P.3d 22, 31 (N.M. Ct. App. 2001), counsel moved for a competency determination on the grounds that the defendant "had ceased eating, was hiding in his room, was crying uncontrollably, and was taking antidepressants."  Affirming the trial court's denial of a competency exam, the court noted counsel submitted no evidence to substantiate the claims.  Id.  Finally, in People v. Eddmonds, 578 N.E.2d 952, 960 (Ill. 1991), the court rejected the claim that defense counsel's testimony of a "general impression" of mental illness in the defendant required a competency hearing.  The court stated such bare assertions did not raise bona fide doubts.  Id.  It also found significant that counsel testified the defendant understood the

charges and proceedings and had discussed them with counsel and that the defendant provided lucid, comprehensive testimony.  Id.

This does not mean, of course, that counsel must submit certain pieces of evidence to obtain a competency exam.  The court remains on a duty to watch a defendant's behavior for signs of irrational conduct and may order an exam *sua sponte*.  Smith, 48 Va. App. at 533-34, 633 S.E.2d at 194.  Indeed, the court must *sua sponte* order an exam where it has probable cause to question the defendant's competence.  Burt v. Uchtman, 422 F.3d 557, 564 (7th Cir. 2005); Jermyn v. Horn, 266 F.3d 257, 283 (3d Cir. 2001).  Aside from this, counsel could present expert testimony or layperson observations, State v. Flores, 124 P.3d 1175, 1184 (N.M. Ct. App. 2005), or even detailed evidence from counsel, United States v. Nichols, 661 F. Supp. 507, 513 (W.D. Mich. 1987) (finding a "four-page, detailed affidavit" from counsel sufficient); Nowitzke v. State, 572 So. 2d 1346, 1349-50 (Fla. 1990) (holding a trial court erred in not conducting a competency hearing where defense counsel detailed extremely paranoid beliefs of the defendant showing "a lack of rational thought process"); Ex parte Gordon, 556 So. 2d 363, 364-65 (Ala. 1988) (ordering a competency exam where three attorneys testified the defendant lacked competency).  Moreover, a defendant's behavior during court may under some circumstances provide the requisite evidence.  United States v. Auen, 846 F.2d 872, 878 (2d Cir. 1988).

Yet even where a defendant has a history of disruptive behavior in court, this does not entitle him to a competency exam where he can understand the proceedings and participate in his defense.  "In other words, [to obtain a competency evaluation] a defendant must exhibit more than bizarre, paranoid behavior, strange words, or a preexisting psychiatric condition that has little bearing on the question of whether the defendant can assist his defense counsel."  People v. Ramos, 101 P.3d 478, 489 (Cal. 2004).

- 10 -

Other cases help to illustrate this point. In <u>State v. Zorzy</u>, 622 A.2d 1217, 1218 (N.H. 1993), the defendant exhibited disruptive behavior while appearing *pro se* at a bail hearing. The defendant ignored the court's instructions and contended he was the victim of an illegitimate prosecution. <u>Id.</u> He also harassed witnesses on irrelevant issues. <u>Id.</u> The court warned the defendant about his mockery of the judicial process. <u>Id.</u> As the hearing ended, the prosecution suggested it would move for a competency exam and the court remarked to the defendant he had "some problems with your noggin." <u>Id.</u> at 1218-19. The prosecution did not ask for a competency evaluation; additionally, the court denied the defendant a continuance to obtain an exam. <u>Id.</u> at 1219. In affirming, the court observed that although "[t]he defendant exhibited disruptive and often annoying behavior . . . he appeared to have a factual as well as rational understanding of the proceedings." <u>Id.</u> at 1220. The court also noted it had no evidence of mental illness. <u>Id.</u> The trial court's suggestions of the defendant's incompetence were dismissed as "tentative speculation." <u>Id.</u> at (internal quotation marks omitted). In <u>State v. Edwards</u>, 507 N.W.2d 393, 395 (Iowa 1993), the defendant also argued his seemingly irrational behavior during court should have resulted in a competency evaluation. The defendant threw a trash can at the court reporter and consistently interrupted the testimony of prosecution witnesses. <u>Id.</u> at 395-96. While speaking with the court, the defendant repeatedly used expletives and stated he expected his lawyer to "yell or scream at the victims." <u>Id.</u> at 396. He indicated his lawyer behaved too kindly towards witnesses. <u>Id.</u> The defendant stated his reasons for expecting this conduct from his lawyer: "*I'm facing life in jail . . . . I got one chance. That's it. When this is over, this is good-by*. You know what I mean." <u>Id.</u> The court held that although the defendant behaved unusually, his actions were "rationally motivated, purposeful, and in keeping with his expressed intention." <u>Id.</u> The defendant "appreciated the seriousness of the

charge and understood the proceedings," even if he did approach them in an unorthodox fashion.
Id.

All of this precedent leads us to affirm the circuit court's decision not to order a competency evaluation. In spite of Johnson's history of disruptive behavior, defense counsel had never previously mentioned the issue of Johnson's competence. When the circuit court raised the issue *sua sponte*, defense counsel responded that "in an abundance of caution" an evaluation would be "unfrivolous." Counsel's actions and statements strongly suggest the defendant was competent. Smith, 48 Va. App. at 535-36, 633 S.E.2d at 195. While defense counsel ultimately sought an examination and stated in support he had difficulty communicating with his client, counsel offered no evidence to support his position. The vague, unsubstantiated representations of counsel did not provide probable cause to doubt Johnson's mental capacity. Reynolds, 86 F.3d at 800.

Furthermore, Johnson's behavior in court before the court denied his motion, while sometimes disruptive, evidenced a rational comprehension of the proceedings. When Johnson interrupted the pre-trial motions hearing, he did so in response to the court's partial denial of one of his motions. He chose to express anger that the court had not ruled in his favor. Johnson also expressed a belief he was not receiving a fair trial, albeit while ranting. It is clear Johnson understood the context of the proceedings. See Edwards, 507 N.W.2d at 395-96; Zorzy, 622 A.2d at 1220; State v. Watson, 504 A.2d 497, 501 (Conn. 1986) (finding significant in upholding the failure to hold a competency hearing that the defendant understood "the court's questions testing his understanding of the plea agreement, the factual basis for the pleas, the meaning of the Alford plea, the constitutional rights which he was waiving, and the adequacy of the advice of counsel").

Proceedings after the court denied the evaluation again reveal no reason to order an evaluation. Johnson clearly and succinctly answered the court's questions regarding whether he wished his counsel to withdraw and whether he wanted to proceed to trial. After the trial commenced, Johnson behaved normally throughout the guilt phase. He gave his plea when asked by the clerk and never displayed aberrant behavior during the guilt phase. When Johnson interrupted the proceedings during the sentencing phase, it was to express his belief Casey was lying. Edwards, 507 N.W.2d at 396. This was a rational thing for Johnson to wish to convey. It is also noteworthy that after the court told Johnson it would remove him from the courtroom if he did not cease his disruptions, he became quiet. Johnson coherently answered questions from his counsel during the sentencing phase, covering just under eight pages of transcript. Eddmonds, 578 N.E.2d at 960.

Johnson's attack on Casey, while criminal, also demonstrated a rational comprehension of what was occurring. Corporal Anns heard Johnson say he hit Casey because Casey "did a lot of people wrong" and Casey "got what he deserved." Johnson believed Casey was "lying on" him. Johnson apparently disapproved of local prosecution policies, as he also threatened to harm Greg Ashwell, another Assistant Commonwealth's Attorney. Johnson expressed pride in his actions to multiple persons after the incident, boasting he would commit the same act again if given the opportunity. It is understandable that Johnson, who Casey had just participated in convicting, would feel anger towards Casey. Johnson expressed that anger through physical violence. Anger often leads to violence. It does not give rise to probable cause of legal incompetence.

While the court itself raised the issue of Johnson's incompetence *sua sponte*, this does not mean the court had to order a competency evaluation. We agree with the reasoning of the New Hampshire Supreme Court that the court's questioning of Johnson's abilities represented

only "tentative speculation." Zorzy, 622 A.2d at 1220. The court's momentary conjecture did not bind it to order an evaluation.

In summary, the record overwhelmingly suggested Johnson possessed mental competence for trial. As another court held, since "the trial judge was not faced with substantial evidence of [Johnson's] incompetence -- and in fact had good reason to think that [Johnson] was competent -- he did not err in failing to" order a competency evaluation. Davis v. Woodford, 384 F.3d 628, 645 (9th Cir. 2003).

### B. Whether the Evidence of Intent to Permanently Injure Sufficed

Johnson next argues the circuit court erred in denying his motion to strike the malicious wounding charge since the evidence showing only a single blow with a fist did not suffice to prove an intent to permanently disfigure Casey, as required by the statute.[3] He contends this represented only assault and battery.

Code § 18.2-51 provides that "[i]f any person maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill," he is guilty of malicious wounding.

Under well established law, "the evidence and all reasonable inferences flowing therefrom must be viewed in the light most favorable to the prevailing party in the trial court," the Commonwealth. Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786 (2003). This principle requires us to "'discard the evidence of the accused in conflict with that of the Commonwealth.'" Parks v. Commonwealth, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980) (quoting Wright v. Commonwealth, 196 Va. 132, 137, 82 S.E.2d 603, 606 (1954)).

---

[3] This represents a different question from whether the defendant acted with malice, although the two are closely related and cases often speak of them together.

In considering the sufficiency of the evidence from a jury verdict, this Court does not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318-19 (1979). Instead, we ask only "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008) (quoting Jackson, 443 U.S. at 319). These principles recognize that an appellate court is "not permitted to reweigh the evidence," Nusbaum v. Berlin, 273 Va. 385, 408, 641 S.E.2d 494, 507 (2007), because appellate courts have no authority "to preside *de novo* over a second trial," Haskins v. Commonwealth, 44 Va. App. 1, 11, 602 S.E.2d 402, 407 (2004).

This deferential standard of review "applies not only to the historical facts themselves, but the inferences from those facts as well." Crowder v. Commonwealth, 41 Va. App. 658, 663 n.2, 588 S.E.2d 384, 387 n.2 (2003). "The inferences to be drawn from proven facts, so long as they are reasonable, are within the province of the trier of fact." Hancock v. Commonwealth, 12 Va. App. 774, 782, 407 S.E.2d 301, 306 (1991). Thus, a jury may "draw reasonable inferences from basic to ultimate facts," Haskins, 44 Va. App. at 10, 602 S.E.2d at 406 (citations omitted), unless doing so would push "into the realm of *non sequitur*," Thomas v. Commonwealth, 48 Va. App. 605, 608, 633 S.E.2d 229, 231 (2006) (citation omitted).

"Intent is the purpose formed in a person's mind at the time an act is committed. Intent may, and often must, be inferred from the facts and circumstances of the case, including the actions and statements of the accused." Commonwealth v. Taylor, 256 Va. 514, 519, 506 S.E.2d 312, 314 (1998) (citations omitted). The finder of fact may infer that a "person intends the natural and probable consequences of his or her acts." Velasquez v. Commonwealth, 276 Va. 326, 330, 661 S.E.2d 454, 456 (2008). The question of whether a defendant possessed the

requisite intent normally rests with the finder of fact. Nobles v. Commonwealth, 218 Va. 548, 551, 238 S.E.2d 808, 810 (1977).

To be guilty under Code § 18.2-51, a person must intend to permanently, not merely temporarily, harm another person. Campbell v. Commonwealth, 12 Va. App. 476, 484, 405 S.E.2d 1, 4 (1991) (*en banc*). Where "a person intentionally takes an action, the probable consequence of which is the permanent disability of another, even if permanent disability does not result, he or she can be found to have intended to cause a permanent disability." Id. at 484, 405 S.E.2d at 4-5.

In Lee v. Commonwealth, 135 Va. 572, 578, 115 S.E. 671, 673 (1923), our Supreme Court held that the act of striking a person with a fist, standing alone, normally does not suffice to prove an intent to permanently harm. The defendant and another man engaged in a fistfight. Id. at 576, 115 S.E. at 672. Eventually the defendant struck the other man in the face, causing a wound necessitating three stitches inside his nose and another six on his skin. Id. at 577, 115 S.E. at 672. Although the evidence was in conflict regarding whether the defendant employed only his fist in striking the blow, the Court held that if the defendant "only used his fist, then there would be no presumption from that fact alone that he intended to permanently disfigure his adversary, and yet some temporary disfigurement would naturally be expected, and would almost necessarily follow, from such a blow." Id. at 578, 115 S.E. at 673.

The holding of Lee must be read in light of other precedent that makes clear a person may be found to have intended permanent harm by an attack with fists where the assailant employs sufficient brutality. As far back as M'Whirt's Case, 44 Va. (3 Gratt.) 594, 611 (1846), it was recognized that while "fists may not, indeed, be regarded generally, as a deadly weapon . . . they become most deadly, by blows often repeated, long continued, and applied to vital and delicate parts of the body of a defenceless, unresisting man, on the ground." Later the Court

enunciated the same principle by stating that "an assault with the bare fists may be attended with such circumstances of violence and brutality that an intent to kill will be presumed." Roark v. Commonwealth, 182 Va. 244, 250, 28 S.E.2d 693, 695-96 (1944); see also Dawkins v. Commonwealth, 186 Va. 55, 64, 41 S.E.2d 500, 504 (1947) (stating that "one may permanently maim, disfigure, disable, or kill with the fists, or knees, if the force is applied with violence and brutality"). The Roark Court elaborated with the example that a strong person "'will not be allowed to approach an unoffending citizen . . . and deal him a deadly blow with his fist in a vital part and when death, the natural consequence of his act, ensues, be heard to say that he merely intended to punish him and not to kill him.'" Roark, 182 Va. at 251, 28 S.E.2d at 696 (quoting State v. John, 72 S.W. 525, 527 (Mo. 1903)). Such a scenario would entail "'unmitigated brutality.'" Id. (quoting John, 72 S.W. at 527).

Our Supreme Court found only a few blows with a fist could prove the intent to permanently injure in Shackelford v. Commonwealth, 183 Va. 423, 32 S.E.2d 682 (1945). There the victim and her sister, the defendant's estranged wife, were staying at the home of their recently deceased mother. Id. at 424, 32 S.E.2d at 683. In the early morning hours, the victim heard her sister and the defendant arguing in the kitchen. Id. at 424-25, 32 S.E.2d at 683. The victim decided to investigate and upon doing this saw her sister appeared injured. Id. The victim asked the defendant to leave, but he became angry and told her he would "finish" her. Id. at 425, 32 S.E.2d at 683. He then struck the victim once in the nose, once in the eye, and once behind her ear. Id. The defendant's wife intervened by grabbing him, enabling the victim to escape to a nearby house. Id. As a result of the attack, the victim suffered a broken nose, a cut over an eye, and severe bruises on both eyes. Id. In considering whether the evidence sufficed to prove intent to permanently injure, the Court noted the defendant was a strong man who "made an unprovoked attack upon a frail woman 50 years of age in her own kitchen. He struck

- 17 -

at least three severe blows . . . with the expressed intention to 'finish' her." Id. at 426-27, 32 S.E.2d at 684. The Court further found relevant that while the encounter lasted only briefly, only the intervention of the defendant's wife brought it to an end. Id. at 427, 32 S.E.2d at 684. Furthermore, when the sheriff arrested the defendant, the defendant "referred to his wife's relatives as a 'bunch of bastards.'" Id. He also "said that he not only struck [the victim] but that he 'followed up' the blow." Id. The Court held the evidence "clearly sufficient to establish" intent. Id.

This Court confronted a situation similar to Shackelford in Williams v. Commonwealth, 13 Va. App. 393, 412 S.E.2d 202 (1991). The defendant there broke into the apartment of his former girlfriend. Id. at 394-95, 412 S.E.2d at 203. He went to his former girlfriend's bedroom and he found a man dressing for work. Id. at 395, 412 S.E.2d at 203. After each ordered the other to depart, the defendant attacked the man, hitting him with his fists between four and five times. Id. The attack continued until police came. Id. The victim had not taken any hostile action against the defendant and was unarmed. Id. After discussing some of the precedent above, we held that given the "unprovoked and brutal assault," the serious nature of the injuries inflicted, and that the attack continued until the arrival of police, it was proper for the court to find an intent to permanently injure. Id. at 398, 412 S.E.2d at 205.

Although we have not previously held in a reported opinion that a single blow with a fist may constitute sufficient evidence to prove an intent to permanently injure, we hold that under the circumstances of this case the jury could make such a determination.

First, Casey did nothing to provoke Johnson's attack (other than prosecute him). Roark, 182 Va. at 251, 28 S.E.2d at 696; M'Whirt's Case, 44 Va. (3 Gratt.) at 611; Williams, 13 Va. App. at 398, 412 S.E.2d at 205. Johnson, in an act of "unmitigated brutality," Roark, 182 Va. at 251, 28 S.E.2d at 696, simply approached Casey and dealt him a closed fist punch to the

head and ear. An unsuspecting victim like Casey is "defenceless," M'Whirt's Case, 44 Va. (3 Gratt.) at 611, making him more likely to suffer serious wounds than someone having the opportunity to prepare for an attack. The lack of provocation is significant evidence of an intent to seriously harm.

Second, the evidence clearly reveals Johnson employed great force in striking Casey. This becomes evident from the fact that Casey suffered a concussion, two cuts in his ear, one of which necessitated four stitches, and soreness in his shoulder lasting several weeks.[4] Shackelford, 183 Va. at 427, 32 S.E.2d at 684; Williams, 13 Va. App. at 398, 412 S.E.2d at 205. It is also clear from the fact that Johnson's momentum from delivering the punch caused him to fall near Casey. One would not normally expect the delivery of a punch to have such a drastic effect on the assailant. Indeed, such a result is inconsistent with a fistfight or even a boxing match, where each party could throw and receive multiple blows while remaining standing. That Johnson utilized such power as to carry him onto the floor with Casey strongly indicates an intent to severely harm. Dawkins, 186 Va. at 62, 41 S.E.2d at 503-04.

Finally, Johnson's consistent statements after the incident reveal a premeditated attack to punish Casey for perceived injustices in local prosecution policies. Johnson expressed pride in his actions and vowed to do the same thing again if given the opportunity. Cf. Rhodes v. Commonwealth, 238 Va. 480, 486, 384 S.E.2d 95, 98-99 (1989) (finding lack of remorse probative of a murder suspect's intent to kill); Archie v. Commonwealth, 14 Va. App. 684, 689, 420 S.E.2d 718, 721 (1992) (same).[5] Johnson stated he "got him good" and that Casey "got

---

[4] Although Casey suffered fewer injuries than the victims in other cases, they still presented a significant harm.

[5] We perceive no reason why contrition should prove relevant in determining an intent to kill, but not an intent to permanently injure. To the contrary, the level of a defendant's braggadocio about a crime may rightly be expected to correlate with the level of harm anticipated and inflicted.

what he deserved." Shackelford, 183 Va. at 427, 32 S.E.2d at 684. The jury could consider this in determining Johnson intended for Casey to suffer serious harm. Cf. Davidson v. Commonwealth, 167 Va. 451, 458, 187 S.E. 437, 440 (1936) (finding "the boast of the accused" relevant to affirming that the defendant acted with malice).

Based on all this evidence, a rational fact finder could discern an intent to permanently injure. The circuit court did not err.

As to the dissent, we simply disagree with the argument that a rational jury could not find an intent to permanently injure. The dissent either ignores or minimizes the evidence considered above. The dissent gives no attention to the unprovoked nature of Johnson's attack, which represents a fact consistently found important by Virginia courts. The dissent similarly disregards the circumstances surrounding the assault concerning how the devastating force of Johnson's blow caused him to fall with Casey. The dissent minimizes the severity of Casey's injuries, claiming they represent simply one result from a range of possibilities. Johnson's repeated bragging receives light consideration as "insufficient to prove he acted with the specific intent." As demonstrated in our analysis above, the jury could evaluate and weigh a number of factors found relevant in prior cases to determine Johnson possessed a specific intent to inflict permanent injury to Casey. Since that holding is rational, we will not disturb it on appeal.

C. Whether the Circuit Court Erred in Denying Johnson's Brady Claims

Lastly, Johnson contends the circuit court erred in denying his motion to set aside the verdict based on the prosecution's failure to disclose evidence that Casey received a reprimand the day he resigned. Johnson maintains the prosecution had a duty to disclose this as it presented information material to punishment.

In Brady v. Maryland, 373 U.S. 83, 87 (1963), the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request

- 20 -

violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." A defendant asserting a <u>Brady</u> violation must satisfy a three-prong test: "'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" <u>Deville v. Commonwealth</u>, 47 Va. App. 754, 756, 627 S.E.2d 530, 532 (2006) (quoting <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999)).

In order for withheld evidence to qualify under <u>Brady</u> and its progeny, it must be material. <u>Jefferson v. Commonwealth</u>, 27 Va. App. 477, 486, 500 S.E.2d 219, 224 (1998). A piece of evidence is material only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985); <u>see also</u> <u>Soering v. Deeds</u>, 255 Va. 457, 464, 499 S.E.2d 514, 517 (1998). This standard does not require a defendant to show the likelihood of a different verdict by a preponderance of the evidence or that insufficient evidence would exist to support the verdict. <u>Kyles v. Whitley</u>, 514 U.S. 419, 434-35 (1995). Courts consider the materiality of undisclosed evidence "collectively, not item by item." <u>Id.</u> at 436. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." <u>United States v. Agurs</u>, 427 U.S. 97, 109-10 (1976); <u>see also</u> <u>Frontanilla v. Commonwealth</u>, 38 Va. App. 220, 227, 562 S.E.2d 706, 709 (2002).

In <u>Taylor v. Commonwealth</u>, 41 Va. App. 429, 435, 585 S.E.2d 839, 842 (2003), we held the failure to disclose witness statements that were not "materially contradictory of or inconsistent with those witness' trial testimony" failed the test of materiality. There the evidence

- 21 -

at trial showed the defendant and another man fired guns at a house.  Id. at 432, 585 S.E.2d at 841.  One witness who testified at trial that the defendant participated in the shooting provided a pre-trial statement identifying the other shooter, but making no mention of the defendant.  Id. at 435, 585 S.E.2d at 842-43.  Another witness who testified as to the defendant's culpability gave a pre-trial statement omitting any consideration of the shooting.  Id. at 435, 585 S.E.2d at 843.  We held that since the trial testimony did not contradict the pre-trial statements, the undisclosed evidence lacked materiality under Brady.  Id.

Other courts have also reached this conclusion.  For instance, in Thompson v. Cain, 161 F.3d 802, 807 (5th Cir. 1998), the defendant claimed the government committed a Brady violation by withholding evidence a witness sought a reward for his testimony.  Yet the witness never testified inconsistently with the defendant's allegations.  Id.  The court concluded that since "there are no inconsistencies between the material that Thompson cites and [the witness'] testimony . . . no Brady violation occurred."  Id.  See also State v. Crawford, 848 So. 2d 615, 627 (La. Ct. App. 2003) (finding that "the 911 log does not contradict Mr. Mitchell's trial testimony and is not Brady material"); State v. Hunter, 648 So. 2d 1025, 1034 (La. Ct. App. 1994) (holding "[t]his is not a contradictory statement and therefore would not constitute Brady material"); People v. Goldman, 573 N.Y.S.2d 282, 285 (N.Y. App. Div. 1991) (finding no Brady violation where "[t]he fact that the officer prepared suggestions for a second potential conversation, did not contradict the witness' trial testimony, in which he essentially admitted that he had been prepared for the first conversation").

We hold the information Johnson claims the prosecution should have disclosed about Casey is not material.  Casey testified he resigned as a prosecutor "[i]n part" because of Johnson's attack on him.  When asked whether other reasons existed, Casey stated he "grew not to like the job."  While information concerning Casey's professional difficulties may have

provided additional relevant background concerning his decision to resign, it would not have contradicted his testimony. Johnson would have had more information to probe the reasons why Casey left, but Casey's testimony as given would remain. This does not suffice to undermine confidence in the outcome. Kyles, 514 U.S. at 435; Taylor, 41 Va. App. at 435, 585 S.E.2d at 842-43.

## IV. CONCLUSION

The circuit court did not err in declining to order a competency evaluation. Confronted only with the vague, unsubstantiated representations of counsel and a history of rational behavior by Johnson, it was reasonable for the circuit court to proceed without an evaluation. Additionally, the evidence sufficed for the jury to infer an intent by Johnson to permanently injure Casey. The lack of provocation by Casey, the severity of Johnson's blow, and the braggadocio by Johnson combine to make it reasonable for a jury to conclude Johnson harbored an intent to seriously injure Casey. Since the jury's finding was rational, this Court will not disturb it. Finally, the evidence Johnson claims the prosecution should have given him under Brady would not have contradicted the prosecution's evidence, thereby making it fail the required test of materiality. For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

Humphreys, J., concurring, in part, and dissenting, in part.

I concur with the majority's holding and analysis with respect to all issues presented with the exception of its holding that the evidence was sufficient to prove an intent to permanently maim, disfigure, disable or kill, as required by Code § 18.2-51. I respectfully dissent from that portion of the majority opinion because I believe the evidence was insufficient to prove such intent.

Code § 18.2-51 provides: "[i]f any person maliciously shoot, stab, cut or wound any person or by any means cause him bodily injury, *with the intent to maim, disfigure, disable, or kill*, he shall, except where it is otherwise provided, be guilty of a Class 3 felony." (Emphasis added). The Supreme Court of Virginia has held that, under ordinary circumstances, the requisite intent cannot simply be presumed from a blow with a bare fist. See Lee v. Commonwealth, 135 Va. 572, 115 S.E. 671 (1923); see also Fletcher v. Commonwealth, 209 Va. 636, 166 S.E.2d 269 (1969). However, as the majority correctly notes, when an assailant employs a sufficient degree of brutality while attacking with his bare fists, the trier of fact may infer the intent to maim, disfigure, disable or kill. See Dawkins v. Commonwealth, 186 Va. 55, 63, 41 S.E.2d 500, 504 (1947). In light of both of these precedents, the question becomes whether the record contains sufficient evidence to prove the defendant employed "a sufficient degree of brutality" to support an inference of an intent to maim, disfigure, disable or kill. Id. I would hold that this record, even when viewed in the light most favorable to the Commonwealth, cannot support such an inference.

The majority finds that from the extent of the injury to the victim, a rational fact finder could discern intent to permanently injure. Essentially, the majority argues backward from the result, holding that the fact that the victim was disfigured as a result of the blow supports a finding that Johnson acted with the requisite intent. The majority relies for this conclusion on

- 24 -

the common law concept that the fact finder may infer that a person intends the natural and probable consequences of his acts. Campbell v. Commonwealth, 12 Va. App. 476, 483-84, 405 S.E.2d 1, 4 (1991) (*en banc*). I do not accept the majority's contention that permanent harm or disfigurement is a "natural and probable consequence" of a single blow with a bare fist, when unaccompanied by other circumstances of unusual violence or brutality.

Although obviously not binding on us, the British House of Lords has provided valuable perspective regarding the phrase "natural and probable consequences," as used in this venerable principle of the common law. In Regina v. Woollin, 4 All ER 103 (1998), the Law Lords overruled precedent from the Court of Appeal of England and Wales, which equated the phrase "natural and probable consequences" to "highly probable." Lord Steyn found that the standard used by the Court of Appeal was not sufficiently analogous to the common law requirement and held that in order for a consequence to be "natural and probable," it must be the "inevitable" result of an action rather than merely "highly probable."

In its most recent pronouncement on the subject, albeit in a civil tort context, our Supreme Court has held that "the injury should have been foreseen *in the light of the attending circumstances.*" Interim Personnel v. Messer, 263 Va. 435, 442, 559 S.E.2d 704, 708 (2002) (emphasis added). The degree to which this standard equates to that of our common law cousins is an intellectual discussion that can be left for another day and a higher court. However, the comparison is instructive in illustrating that the historical construction of the phrase does not support a finding that a specific intent can be discerned from a merely theoretically possible outcome, which seems to me to be the essence of the majority's holding in this case.

Under Virginia law, maiming, disfigurement, disablement or death are not the inevitable, probable, or reasonably foreseeable consequences of a blow with a bare fist. Thus, an assailant's intent to render such harm with his fist must be discerned from either his statements or unusual

"circumstances of violence and brutality." Roark v. Commonwealth, 182 Va. 244, 250, 28 S.E.2d 693, 695-96 (1944). Because Johnson's blow was not accompanied by such statements or circumstances, I do not believe that the evidence supports an inference of intent to maim, disfigure, disable or kill.

The cases cited by the majority in support of its position are easily distinguished from the case at bar. In Shackelford v. Commonwealth, 183 Va. 423, 425, 32 S.E.2d 682, 683 (1945), the defendant stated, "this time I will finish you" before repeatedly striking the victim in the nose, head, and ear. In affirming his conviction, the Supreme Court of Virginia found that the defendant acted with the intent to permanently injure as evidenced by his statements both before and after the attack. Id. at 427, 32 S.E.2d at 684. The Court emphasized that the defendant "struck at least three severe blows on her face and head *with the expressed intention to 'finish' her*." Id. (emphasis added).

Like Shackelford, the assault at issue in Williams v. Commonwealth, 13 Va. App. 393, 395, 412 S.E.2d 202, 203 (1991), was accompanied by circumstances supporting an inference of the requisite intent. In Williams, the defendant broke into the house of a former girlfriend where he found a man dressing for work. Id. The defendant proceeded to attack the man, striking him repeatedly until the police arrived. Id. Two days before the incident, the defendant wrote his former girlfriend a note stating, "your ass . . . can run but you can't hide." Id. This Court affirmed the conviction based upon the unusual level of violence and brutality finding "[t]he record supports the trial court's determination that the attack on [the victim] was made by [the defendant] with the intent to maim, disfigure, disable or kill." Id. at 398, 412 S.E.2d at 205.

The circumstances surrounding Johnson's assault are decidedly different from those in Shackelford and Williams. In this case, even viewing the evidence in the light most favorable to the Commonwealth, the record is devoid of either direct evidence of specific intent as existed in

Shackelford or circumstantial evidence of unusual violence or brutality to support an inference that Johnson acted with the specific intent as was the case in Williams. In contrast to those cases, Johnson's attack involved but a single blow with the fist, without any accompanying statements expressing an intention to maim, disfigure, disable or kill. The majority gives great weight to the fact that "Johnson expressed pride in his actions and vowed to do the same thing again if given the opportunity. Johnson stated he 'got him good' and that [the victim] 'got what he deserved.'" While these statements illustrate Johnson's lack of remorse for his actions, they are insufficient to prove he acted with the specific intent to maim, disfigure, disable or kill at the time of the assault, as required by Code § 18.2-51.

A single blow with the fist may reasonably result in a range of *possible* injuries, running the gamut from a temporary bruise or contusion through a laceration resulting in a permanent scar, as is the case here, to the other end of the spectrum where such a blow may result in severe, permanent neurological damage. Common sense would seem to suggest that the severity of injuries resulting from a single blow with a closed fist are a function of a number of variables including the strength of the assailant, the amount of force used, the victim's physical condition, and whether the damage has been compounded by the victim striking furniture or other objects as he fell. This record is bereft of any evidence that the nature of the injuries sustained were anything more than merely a *possible* result of Johnson's single blow with his fist. Thus, an inference that the result was intended is insufficient here as a matter of law to sustain a conviction for malicious wounding.

In conclusion, without some evidence that Johnson intended to cause the injuries that resulted in the form of contemporaneous statements, use of a weapon, or other evidence of *unusual* violence or brutality, one cannot reason backward from the result, as the majority has done, and find the requisite intent solely from the resulting injury and a remorseless comment.

What the majority has done today is extend its holding beyond established precedent, a point they themselves recognize: "Although we have not previously held in a reported opinion that a single blow with a bare fist may constitute sufficient evidence to prove an intent to permanently injure, we hold that under the circumstances of this case the jury could make such a determination." In so doing, the majority has lowered the bar of a previously significant permissible inference to the point that in the future, it will require little, if any, effort to step over it.

For these reasons, I believe the trial court erred in finding the evidence, on the issue of intent, sufficient to convict Johnson of malicious wounding under Code § 18.2-51. At most, I believe the evidence supports a conviction of the lesser-included offense of assault and battery, and I would reverse and remand this case to the trial court for the entry of a judgment and sentence for that offense. See Commonwealth v. South, 272 Va. 1, 630 S.E.2d 318 (2006).