PRESENT: All the Justices

LAM DANG

v.  Record No. 130553

COMMONWEALTH OF VIRGINIA

OPINION BY
JUSTICE ELIZABETH A. McCLANAHAN
JANUARY 10, 2014

FROM THE COURT OF APPEALS OF VIRGINIA

A jury convicted Lam Dang of one count each of murder and violation of a protective order.  Relying on Code § 19.2-169.1, Dang argues on appeal that the circuit court erred in failing to order a second competency evaluation after his counsel discovered new information regarding Dang's life history and physical trauma he suffered as a child.  We reject Dang's argument and will affirm his convictions.

I. BACKGROUND

A.  Competency Evaluation Report

After Dang was charged with murder and felony protective order violation for the death of Nguyet Lu, the Fairfax County Juvenile and Domestic Relations Court granted Dang's motion for a competency evaluation pursuant to Code § 19.2-169.1.  On January 12, 2011, Dr. Kristen A. Hudacek, a court-appointed psychologist, submitted an evaluation of competency report in which she found Dang competent to stand trial.  Her evaluation was based on the background information provided to her by Dang and his counsel as well as her own clinical observations.

Because Dang's preferred speaking language is Vietnamese, an interpreter assisted in translation during Dr. Hudacek's evaluation. Dang, who was 40 years old at the time of the evaluation, informed Dr. Hudacek that he was born in South Vietnam and moved to Philadelphia at the age of 17. He denied having any prior psychological problems or history of hospitalization for mental health related issues. Dr. Hudacek noted that despite her inability to gain additional information from collateral sources, she "believes the information is an accurate portrayal of [Dang's] current functioning as it relates to the question of competency to stand trial."

In evaluating whether Dang was competent to stand trial, Dr. Hudacek considered Dang's understanding of the legal process, appreciation of the legal process as it applied to his case, capacity to communicate with his counsel, and capacity to make decisions. According to Dr. Hudacek, Dang understood he was charged with "[m]urder, killing someone, second degree" and could receive "up to 40 years in jail."[1] He also understood the roles of the jury, the judge, his lawyer and the Commonwealth's Attorney. Dang understood his attorney was "working on his behalf" and "the importance of relaying information about the

---

[1] Although the Commonwealth ultimately pursued a conviction for murder in the first degree, Dang gave the correct sentence for murder of the second degree. See Code § 18.2-32.

facts of his case." Dang stated "he would speak to his attorney if he wanted to relay information about any concerns he had during a hearing or trial." Although "Dang was mostly able to provide a rational, logical, coherent explanation of facts that would aid his attorney in defending him," Dr. Hudacek noted that he "does become very focused on providing information that may paint him in a favorable light." According to Dr. Hudacek, Dang "was able to discuss his legal situation in a manner that demonstrated weighing his options and basing decisions upon the potential best outcome given the circumstances and after conferring with counsel."

Dr. Hudacek stated that while Dang's speech was coherent, "he frequently shifted topics to the time of the offense and facts related to his relationship with the alleged victim." For example, prior to the start of the interview, Dang "immediately began speaking about his case after [Dr. Hudacek] introduced herself" and "was asked three times to stop talking until his interpreter arrived." The information Dang related to Dr. Hudacek "included facts about the case that would have been best kept for discussion with his attorney or following full disclosure of the nature and purpose of the interview." Finding it necessary to repeatedly re-direct Dang to the questions posed, Dr. Hudacek noted Dang "seemed highly focused on

3

providing 'his side of the story'" and/or "worried about his situation."

Dr. Hudacek reported that Dang "was highly concerned about going to trial, as he believed [his life] would be over." He presented "in a manner that appear[ed] related to anxiety about the alleged charges and potential sentence he is facing." Dr. Hudacek explained that his situational anxiety "does not suggest that [he] suffers from a major mental illness that would affect abilities relevant to competency to stand trial." Although she noted that Dang tended to "become anxious and excitable" in persisting to relay facts regarding his case, his impulse in this regard "is consistent with most defendants who face legal charges."

In determining that Dang was competent to stand trial, Dr. Hudacek stated that "it does not appear that [Dang] currently suffers from a mental illness and/or cognitive or intellectual impairment." Furthermore, Dr. Hudacek did not believe that "Dang's capacity to communicate with counsel is impaired by mental illness." Based on Dr. Hudacek's evaluation and the information available to her, she concluded that "Dang has sufficient, present ability to consult with his attorney with a reasonable degree of rational understanding," "possesses a rational as well as factual understanding of the proceedings

4

against him," and "is able to assist in preparing for his own defense."

B. Motion for Second Competency Evaluation Before Trial

Dang's counsel moved for a second competency evaluation on December 1, 2011, eleven months after the first evaluation and four days prior to his trial, which was scheduled to begin on December 5.[2] According to the motion, on November 30, 2011, Dang's counsel learned "extensive information about Mr. Dang's history, family, and childhood which dramatically differs from the versions previously provided by Mr. Dang" giving counsel reason to believe that Dang "has over a 30 year history of suffering from developmental disabilities, cognitive functioning difficulties, effects of traumatic brain injury, and mental illness including but not limited to post-traumatic stress disorder."

At the hearing on the motion, counsel stated that the new information regarding Dang's history was discovered when plans were being made for Dang's family to travel from Pennsylvania for the trial. In particular, Mrs. Hoa Pham, who identified

_____

[2] The motion was filed on Thursday and noticed for hearing on the Friday before the trial's commencement on the ensuing Monday. The motion also included a request for a second evaluation of sanity at the time of the offense. The request for the evaluation of sanity at the time of the offense is not before us on appeal.

5

herself as Dang's biological mother, told defense counsel that beginning at the approximate age of 6 years, Dang was subjected to repeated physical assaults from teenagers and young adults as a result of "his appearance as someone who was American."[3]  Mrs. Pham said she found Dang "beaten in the head with rocks," and "there were times when she was afraid his brain was going to come through his skull."  By Mrs. Pham's account, the beatings continued until Dang was in sixth or seventh grade at which point he stopped going to school.  She believed the history of physical trauma to Dang adversely affected his mental health and potentially caused traumatic brain injury impairing his cognitive functioning.  Counsel also informed the court that Dang's sister "confirmed that she saw Mr. Dang exhibiting symptoms of mental illness or similar trauma as well."

---

[3] Defense counsel explained that Dang had informed counsel he lived with an adoptive family and had never met his biological mother.  While he had been reluctant to share names and contact information of any family members, he eventually provided counsel with the name of a family member from whom counsel obtained contact information for Mrs. Pham.  Counsel initially relied upon a family member to relay information from Mrs. Pham, who resides in Philadelphia and speaks only Vietnamese.  However, when the defense team sentencing advocate spoke directly to Mrs. Pham, by telephone through an interpreter, she provided new information.  According to Mrs. Pham, Dang's father was an American serviceman, and when Dang began attending school, he "began to appear to be more American physically."

As a result of the information learned from Mrs. Pham and Dang's sister, counsel spoke with the mental health professional who conducted the evaluation of Dang's sanity at the time of the offense.  According to counsel, this individual indicated that such trauma could support a potential diagnosis of post-traumatic stress disorder and, in a severe case, it would not be uncommon for the patient to develop delusions of his life to replace the actual traumatic life history.  Counsel also informed the court that communications with Dang had been difficult during the three months defense counsel had been working with him, that Dang was repeatedly confused and unable to recall recent discussions, and unable to focus conversations on issues that are relevant.  Based on the newly reported history of head trauma and counsel's concern that Dang might be "operating under some delusion," counsel asked for an evaluation to determine "whether [Dang] is able to effectively communicate with us and assist us in preparing his defense."

Finding no probable cause to believe that Dang "lacks substantial capacity to understand the proceedings against him or to assist his attorney in his own defense," the circuit court denied the motion.  The court explained that the report of the competency evaluation previously conducted indicated that Dang understood the proceedings against him and was able to assist his attorney in his own defense.  According to the court, while

7

there appeared to be "an element of a lack of candor," it found no basis in the record to grant the motion.

C.   Plea Colloquy[4]

On the morning of trial, the circuit court conducted a plea colloquy with Dang, in which Dang pled not guilty to the charges of murder and violation of a protective order.[5]  During the colloquy, Dang provided his name and date of birth, denied being under the influence of alcohol or drugs, stated that he understood the charges against him and had discussed these charges with his counsel.  Dang told the court he had given his attorneys the names of any witnesses who could testify on his behalf, that he was satisfied with the services provided by his attorneys, and that he voluntarily made the decision to plead not guilty.

Dang also stated that he understood he had a right not to testify on his own behalf or to testify if he so chose, and that his counsel had discussed with and advised him regarding the question of whether he should testify or not.  In response to the court's inquiry as to his decision to have his case tried by a jury or judge, Dang expressed his desire to be tried by a

---

[4] Interpreters were present throughout the trial proceedings.

[5] Prior to conducting the plea colloquy, defense counsel renewed the motion for a competency evaluation, which the circuit court denied for the reasons given at the hearing.

jury. Dang acknowledged that if the jury found him guilty, the jury would also determine the appropriate punishment. Dang confirmed that he understood all of the questions from the court and had no questions of his own for the court.

During the plea colloquy, there were instances in which Dang responded to the court's questions by providing facts or explanation regarding the murder. For example, when asked if Dang had given his counsel the names of witnesses, Dang initially replied that he had and that he "was drunk." The court interrupted Dang and explained that Dang was not being asked for his defense but whether he had given the names of witnesses to his counsel and whether they were present. A discussion then ensued between the court and Dang as to the witnesses that might testify on Dang's behalf. Additionally, in response to the court's inquiry as to whether Dang's plea of not guilty was voluntarily made, Dang stated that he saw "the video," referring to a security camera recording of the murder. He added, "I don't believe that I killed her," "I did not intend [to kill her]," and "She hit me." Upon being redirected by the court to the question asked, Dang responded appropriately.

> THE COURT: Mr. Dang, that's not what I'm asking you. The question I'm asking you is this: You are pleading not guilty; is that correct?
>
> THE DEFENDANT: Yes.

THE COURT: Are you pleading not guilty because you think that's what you ought to do and it's a voluntary decision on your part?

THE DEFENDANT: Yes.

Following the colloquy, the circuit court accepted Dang's plea of not guilty, finding it had been made freely and voluntarily. Because Dang told the court there was information he still would like to share with his counsel, the circuit court took a recess at the conclusion of the colloquy to afford Dang an opportunity to meet with counsel and "see if there's anything else he wants to tell you."

D.    Renewed Motion for Competency Evaluation and Second Colloquy

Upon returning from the recess, Dang's counsel renewed, again, the motion for an evaluation of Dang's competency to stand trial. According to counsel, Dang expressed feeling that "he is not normal right now," is "forgetting things," and "only understands a little bit about what is happening." In addition, counsel told the court that Dang expressed "for the first time ever in our communications with him that he believes he is facing capital punishment." Counsel believed that Dang's "mental status is deteriorating, which is not unusual for people who suffer from mental illness." Counsel stated that "as of just a few minutes ago – during this recess – in counsel's opinion, there's probable cause to believe that Mr. Dang both

10

does not understand the nature of the proceedings against him and is unable to effectively communicate with counsel in order to assist in his defense and is, in fact, unable to participate in his defense in several critical ways."

In response to counsel's motion, the circuit court stated:

> But I also have the advantage of additional information now [than at the hearing], and that is that I've done the not-guilty colloquy with your client, and what strikes me is that he certainly was able to understand my questions – in some cases I had to explain them, but that's not unusual – and his responses were intelligent. And, it is true, he wanted to tell me more than I was asking him, but that's also not unusual.
>
> So, I also have the benefit of having now heard from your client directly for the first time, and what strikes me is that he came across to me as entirely rational. There was something he wanted to tell you, which I gave him the opportunity to do, so you could talk with him.

At defense counsel's request,[6] the circuit court conducted an additional colloquy with Dang:

THE COURT:  Do you understand who I am?

THE DEFENDANT:  Why?

THE COURT:  No.  Do you understand who the judge is?

---

[6] Before the circuit court conducted the colloquy, it expressed concern to Dang's counsel regarding the risk that statements made by Dang could be used by the Commonwealth during trial.  While acknowledging that risk, Dang's counsel confirmed the request for an inquiry "into Mr. Dang's appropriateness for an evaluation of his competency to stand trial."

THE DEFENDANT: Yes, I do.

THE COURT: And what role does the judge play in the case?

THE DEFENDANT: To listen to the case.

THE COURT: And what do I do after I listen to the case?

THE DEFENDANT: I don't know.

THE COURT: Do you understand that you're on trial today?

THE DEFENDANT: Yes, I know.

THE COURT: Do you know what you're charged with?

THE DEFENDANT: Yes. Murder.

THE COURT: And do you know what else you're charged with?

THE DEFENDANT: No.

THE COURT: Do you know what the sentence is that if you're found guilty that a jury might impose in this case or might decide was the appropriate sentence for murder?

THE DEFENDANT: Yes, but it was not my intention —

THE COURT: No, but I'm asking you, what is the most sentence that a jury could impose in this case? Do you know?

THE DEFENDANT: Yes. My lawyer did mention to me that maybe thirty years.

THE COURT: Who are your lawyers?

THE DEFENDANT: Right here next to me.

THE COURT: Do you know their names?

THE DEFENDANT:  Sarah.

THE COURT:  And what about the other attorney?

THE DEFENDANT:  Robert.[7]

THE COURT:  Okay.  And do you know that there is also a prosecutor in the courtroom who is involved in the case?

THE DEFENDANT:  I have never heard the word "prosecutor."

THE COURT:  What about the Commonwealth Attorney?  Have you ever heard that phrase?

THE DEFENDANT:  No.

THE COURT:  Now, how are you feeling today?

THE DEFENDANT:  I feel okay, but since I've been here I haven't been normal.  I feel kind of weird.  I feel sometimes I'm okay, but I'm not crazy.  But my mind sometimes is not here in some situations.  It doesn't seem right to me.

I just want you to know that I do kind of understand, but I just don't feel okay today.  I've never known about the law or anything.  I just know I go to work, I go home to my family and take care of myself.  Other than that, I never, like, know anything about the law.

THE COURT: Do you know that the maximum penalty for murder is life in prison if the Commonwealth is not seeking the death penalty?

THE DEFENDANT:  I don't know.  I don't know why I even kill people.

THE COURT:  You don't know what?

_____

[7] Dang's trial attorneys were Lysandra Pachuta and Robert Frank.

13

THE DEFENDANT:  I don't know why I even kill.  I don't know why.

THE COURT:  Do you know that you're also charged with violating a protective order?

THE DEFENDANT:  I don't know.  I didn't know.

THE COURT:  Well, when I asked you questions a little while ago, you said you were aware of the fact that you were charged with violating a protective order.  You pled not guilty to it.

THE DEFENDANT:  I know I killed someone, but I plead not guilty because it was not my intention – because they hit me, they attacked me, and I couldn't take it no more.  And I have evidence – I have the work from the doctor, that I had stab wounds.

And I was drunk, and then I had a knife and I just went after her.  And I stabbed and I threw the knife away.  I put the knife down, and I don't know what else happened.  And then the police took me to the hospital, and then the next day is when I realized that I killed someone.

THE COURT:  Okay.  Have a seat.

Following the colloquy, the circuit court denied the renewed motion for a second competency evaluation, explaining,

certainly the answers the Defendant gave were not by any means a showing of perfect clarity, but I believe he understands why he's here today and he understands what we're doing.

He certainly has a – he articulates a defense to the offenses – the principal offense with which he's charged, which is the first-degree murder.  In the colloquy he both pled not guilty and confirmed that he was the person charged with that event.

And when I combine everything I've heard today from the Defendant, I do not see a basis to

14

> order the competency exam – in other words, to change the decision that I made last Friday – and that will remain my decision.

At trial, the evidence proved Dang entered into a restaurant in Fairfax County where Nguyet Lu was eating with her boyfriend and another individual. Dang approached Lu and stabbed her with a knife. Lu died from stab wounds to her neck and abdomen, and was pronounced dead at the scene. Upon completion of the three-day trial, the jury found Dang guilty of first-degree murder and violation of the protective order. In accordance with the verdict, the circuit court imposed sentences of life and five years' imprisonment on the two convictions. Dang appealed his convictions to the Court of Appeals, which denied his petition for appeal by per curiam order and again by a three-judge panel.

## II.    ANALYSIS

On appeal, Dang argues the Court of Appeals erred in denying his appeal because there was probable cause to believe he was incompetent to stand trial under Code § 19.2-169.1(A).

A.    Code § 19.2-169.1(A)

"It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial." Medina v. California, 505 U.S. 437, 439 (1992); see also Drope v. Missouri, 420 U.S. 162, 171-72 (1975); Pate v. Robinson, 383

15

U.S. 375, 385(1966). Therefore, due process requires that states provide criminal defendants "access to procedures for making a competency evaluation." Medina, 505 U.S. at 449.[8]

The General Assembly has provided criminal defendants access to such procedures in Code § 19.2-169.1. Pursuant to this statute, "the court shall order that a competency evaluation" of the defendant be performed by a mental health expert if "there is probable cause to believe that the defendant . . . lacks substantial capacity to understand the proceedings against him or to assist his attorney in his own defense." Code § 19.2-169.1(A). This language reflects the standard for competency articulated by the Supreme Court of the United States, which is "whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" Godinez v. Moran, 509 U.S. 389, 396 (1993) (quoting Dusky v. United States, 362 U.S. 402, 402 (1960)). See Orndorff v. Commonwealth, 271

---

[8] The Supreme Court of the United States has held that a state procedure requiring a hearing on competency where the evidence raises a "bona fide doubt" as to the defendant's competency is constitutionally adequate, as is a state procedure requiring an examination where there is "reasonable cause" to believe that the defendant is incompetent. Drope, 420 U.S. at 172-73.

16

Va. 486, 500, 628 S.E.2d 344, 351 (2006) (discussing ultimate determination of whether defendant is competent pursuant to Code § 19.2-169.1(E) in light of constitutional standard of competency).

When the defendant has already been afforded a competency evaluation in which he is found competent, the circuit court need not order a second evaluation unless it is presented with a substantial change in circumstances. See Drope, 420 U.S. at 181 (trial court required to order competency examination when there were "circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial"); Senna v. Patrissi, 5 F.3d 18, 20 (2d Cir. 1993) (no constitutional requirement for additional competency hearing where there is "no substantial change" in defendant's condition); People v. Kelly, 822 P.2d 385, 412 (Cal. 1992) (where defendant has already been found competent, it is unnecessary to conduct a second hearing on competency unless the court is presented with a "substantial change of circumstances" or new evidence "casting a serious doubt on the validity of that finding"); State v. Lafferty, 20 P.3d 342, 360 (Utah 2001) (same); State v. Sanders, 549 S.E.2d 40, 52 (W. Va. 2001)(same).

B.    Standard of Review

The statutory mandate, that an evaluation be ordered if there is "probable cause to believe" that the defendant is

17

incompetent to stand trial, Code § 19.2-169.1(A), involves the exercise of discretion by the circuit court in weighing the facts presented on the question of competency.  See Orndorff, 271 Va. at 500, 628 S.E.2d at 351 (determination of competency is a question of fact that will not be disturbed on appeal unless plainly wrong); see also Johnson v. Commonwealth, 53 Va. App. 79, 93, 669 S.E.2d 368, 375 (2008) ("We review a circuit court's decision not to order a competency evaluation only for abuse of discretion.").  This is so because the circuit court "will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant."  Indiana v. Edwards, 554 U.S. 164, 177 (2008); see also United States v. Mason, 52 F.3d 1286, 1289 (4th Cir. 1995) (whether "reasonable cause" to believe a defendant may be incompetent exists under 18 U.S.C. § 4241(a) is a question left to the discretion of the trial court).[9]

---

[9] See also Denes v. State, 508 N.E.2d 6, 9-10 (Ind. 1987) (decision of whether to order competency hearing reviewed for abuse of discretion); State v. Barnes, 262 P.3d 297, 309 (Kan. 2011) (decision of whether to order competency evaluation reviewed for abuse of discretion); State v. Hewett, 538 A.2d 268, 269 (Me. 1988) (decision of whether to order competency hearing reviewed for abuse of discretion); Morales v. State, 992 P.2d 252, 254 (Nev. 2000) (decision of whether to order competency evaluation reviewed for abuse of discretion); People v. Morgan, 662 N.E.2d 260, 261 (N.Y. 1995) (same); State v. Drayton, 243 S.E.2d 458, 459 (S.C. 1978) (same); Garza v. State, 522 S.W.2d 693, 694 (Tex. Crim. App. 1975) (decision of whether to order competency hearing reviewed for abuse of discretion);

18

We have held that a circuit court abuses its discretion "when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment." Landrum v. Chippenham & Johnston-Willis Hosps., 282 Va. 346, 352, 717 S.E.2d 134, 137 (2011) (quoting Kern v. TXO Production Corp., 738 F.2d 968, 970 (8th Cir. 1984)); see also Drope, 420 U.S. at 179 (reviewing whether state courts failed "to give proper weight" to evidence regarding competency to stand trial).[10]

C.   Circuit Court's Finding of No Probable Cause

---

In re Fleming, 16 P.3d 610, 615 (Wash. 2001) (decision of whether to order competency evaluation reviewed for abuse of discretion); United States v. Davis, 61 F.3d 291, 304 (5th Cir. 1995) (decision of whether to order competency hearing under 18 U.S.C. § 4241 reviewed for abuse of discretion); Zapata v. Estelle, 588 F.2d 1017, 1020-21 (5th Cir. 1979) (decision by state court of whether to order competency hearing reviewed for abuse of discretion); United States v. Andrews, 469 F.3d 1113, 1121 (7th Cir. 2006) (decision to hold hearing or order examination under 18 U.S.C. § 4241 reviewed for abuse of discretion).

[10] Although the dissent agrees that a circuit court's finding that probable cause did not exist to order a competency evaluation should be reviewed for an abuse of discretion, it seems to review the circuit court's decision here de novo. Under an abuse of discretion standard of review, it is neither our function to "consider" the evidence, nor to determine that "the facts here are sufficient to meet the probable cause standard fixed by Code § 19.2-169.1(A)."

Applying these principles, we do not believe the circuit court abused its discretion in finding that there was no probable cause to believe that Dang "lack[ed] substantial capacity to understand the proceedings against him or to assist his attorney in his own defense."  Code § 19.2-169.1(A).

1.   Family Information and Past Trauma

First, Dang argues that the circuit court failed to give due weight to the information regarding Dang's family history that came to light shortly before trial.

According to Dang, "[t]he most significant factor in this case that established probable cause for a competency evaluation was that Mr. Dang appeared to have constructed a completely false life history, or at least one that significantly deviated from his mother's recollection as expressed to defense counsel." Because Dang failed to disclose the history of serious head trauma suffered during his childhood in Vietnam and the existence of his biological family in Philadelphia, defense counsel suggests Dang may have constructed "an entire delusion about his past life to replace his real, traumatic life." Relying on defense counsel's conversation with the evaluator who performed Dang's sanity at the time of the offense evaluation, Dang contends that such a delusion would not be unusual if he had suffered post-traumatic stress disorder, and the trauma

20

reportedly experienced by him could support such a potential diagnosis.

Furthermore, citing treatises discussing the relationship between traumatic brain injury and violent criminal behavior, Dang argues this information may have "substantiated an evaluation" of Dang for traumatic brain injury or another form of organic brain injury. Thus, according to Dang, while his failure to communicate about his life history could have been characterized as a lack of candor, it could also have been "a symptom of an underlying mental illness or organic brain injury that was affecting his competence."

We disagree that the circuit court failed to give proper weight to the information learned by defense counsel from Mrs. Pham and Dang's sister. In response to defense counsel's argument that Dr. Hudacek made note of the fact that she did not have access to collateral sources, the circuit court pointed to Dr. Hudacek's conclusion that despite her inability to gain additional information from collateral sources, she "believes the information is an accurate portrayal of [Dang's] current functioning as it relates to the question of competency to stand trial." As the circuit court explained at the hearing, it reviewed Dr. Hudacek's report, noting that the evaluation was "thorough" and the report "goes into great detail as to the

defendant's understanding of the proceedings against him and his ability to assist his attorney in his own defense."

As the circuit court properly recognized, the issue before it was Dang's present ability to understand the proceedings and assist his counsel as was addressed in Dr. Hudacek's report. A history of mental illness does not necessarily render a defendant incompetent to stand trial. See Bramblett v. Commonwealth, 257 Va. 263, 273, 513 S.E.2d 400, 407 (1999)(defendant diagnosed as presently suffering from delusional disorder competent to stand trial). As the Fourth Circuit Court of Appeals has explained, "neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." Walton v. Angelone, 321 F.3d 442, 460 (4th Cir. 2003) (citation omitted). Rather, as noted above, the legal test for competency is "whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.'" Godinez, 509 U.S. at 396 (quoting Dusky, 362 U.S. at 402) (emphasis added). Therefore, the evidence supporting probable cause must be directed to the question of defendant's competency at the time of trial.

22

Thus, even if Dang's failure to disclose an accurate history to his counsel and his evaluator was, as he posits, an indication of an underlying mental illness or brain injury, there was no information before the circuit court to relate any possible mental illness or injury to Dang's present competence. In light of Dr. Hudacek's opinion that was addressed to Dang's "current functioning," the circuit court appropriately inquired:

> Focusing on his competency today, is it not fair to say that what you're identifying is that your client has not been candid with you, which does not seem to me to be a competency issue, and then beyond that, you're just speculating about what effect it could – it might have?

(Emphasis added.)

The circuit court was properly focused on the issue of Dang's present competence. The information gained from Mrs. Pham related to injuries reportedly sustained by Dang decades prior to the murder and did not provide evidence of a substantial change in Dang's competence. With nothing more than counsel's speculation that the information from Mrs. Pham and Dang's sister could potentially change Dr. Hudacek's opinion or otherwise bear on Dang's present ability to understand the proceedings or assist in his defense, we do not believe the circuit court failed to give proper weight to such information.

    2.   Dang's Responses at Trial

23

Dang also contends the circuit court neglected to afford due weight to the answers given by him during the colloquies conducted by the court on the morning of trial. According to Dang, throughout the plea colloquy and the subsequent colloquy conducted by the court at defense counsel's request, Dang gave nonresponsive answers indicating his lack of comprehension of the criminal proceedings against him.

While many of Dang's responses to the circuit court's questions were indeed nonresponsive, as the circuit court recognized, Dang's tendency to shift focus to the facts regarding the murder and explain "his side of the story" was addressed extensively by Dr. Hudacek in her report. According to Dr. Hudacek, Dang's behavior in this regard was "related to anxiety about the alleged charges and potential sentence he is facing," "does not suggest that [he] suffers from a major mental illness that would affect abilities relevant to competency to stand trial," and "is consistent with most defendants who face legal charges." In other words, the responses Dang gave to the circuit court were consistent with the behavior he exhibited during his evaluation. Despite this behavior, Dr. Hudacek concluded that "Dang has sufficient, present ability to consult with his attorney with a reasonable degree of rational understanding," "possesses a rational as well as factual

understanding of the proceedings against him," and "is able to assist in preparing for his own defense."

During the plea colloquy, Dang certainly gave appropriate and rational answers to the court's initial inquiry regarding his understanding of the charges against him, the role of defense counsel, his discussions with counsel regarding possible witnesses on his behalf, his right to testify and be tried by a jury, and the voluntariness of his plea. Although Dang attempted to interpose his explanation for the murder, when redirected to the question, he gave appropriate responses.

During the subsequent colloquy, Dang's propensity to interject and explain his actions became more pronounced. This was entirely in accord with Dr. Hudacek's opinion that Dang's inclination toward nonresponsive answers reflected apprehension "about going to trial" and the "potential sentence he is facing." As Dang told the court during the second colloquy, "I feel okay, but since I've been here I haven't been normal." Dang also stated, "I just want you to know that I do kind of understand, but I just don't feel okay today." Dang's increase in anxiety after the plea colloquy was evidenced by defense counsel's observation that Dang's mental status had deteriorated "as of just a few minutes ago – during this recess." It was reasonable, therefore, to conclude that Dang's responses during the second colloquy were a reflection of heightened apprehension

25

of going to trial, rather than a sudden deterioration in his understanding of the nature of the proceedings on the morning of trial.[11]  In fact, as the circuit court remarked, Dang was sufficiently competent to "articulate[] a defense" to the murder charge.

Recognizing that circuit courts "are in the best position to make competency determinations, which at bottom rely not only on a defendant's behavioral history and relevant medical opinions, but also on the [circuit] court's first-hand interactions with, and observations of, the defendant and the attorneys at bar, we appropriately afford them wide latitude." United States v. Bernard, 708 F.3d 583, 593 (4th Cir. 2013).  In light of Dr. Hudacek's opinion that Dang's inclination to shift focus represented situational anxiety regarding the proceedings and potential punishment, we do not believe the circuit court

_____

[11] Given Dang's difficulty with the English language, it is not surprising that he referred to his counsel, Lysandra Pachuta, as "Sarah."  Likewise, we do not find it remarkable that Dang was unable to articulate the charge of violation of a protective order or was unfamiliar with the terms "prosecutor" and "Commonwealth Attorney."  Based on Dang's responses during the plea colloquy, he knew he was charged with murder and violation of a protective order, understood he was in court to be tried for those charges, and was well aware that he faced substantial punishment if found guilty by the jury.  It is also evident from the record that Dang knew his defense counsel and their role in assisting him with his defense.

failed to properly consider and weigh Dang's responses to the court.

3. Defense Counsel's Concerns

Dang also argues that the circuit court failed to give sufficient weight to defense counsel's concerns regarding his competency.

As the Supreme Court of the United States has recognized, due process does not require courts to "accept without question[ing] a lawyer's representations concerning the competence of his client." Drope, 420 U.S. at 177 n.13. "[A]n expressed doubt" by defense counsel "is unquestionably a factor which should be considered." Id. While "counsel's representations deserve serious consideration" by the circuit court, they "cannot, however, assume an importance not merited by their content, particularly in those situations in which the [circuit] court has had an opportunity to make its own observations." People v. Morino, 743 P.2d 49, 52 (Colo. App. 1987). "We must also bear in mind the [circuit] court's institutional advantage over [this Court] in evaluating the demeanor of the defendant and the statements of counsel about the defendant's mental state." United States v. Rickert, 685 F.3d 760, 767 (8th Cir. 2012).

Based on our review of the record, we believe the circuit court gave defense counsel's concerns serious consideration.

27

During the hearing on the motion for a second evaluation, defense counsel told the court that communications with Dang had been "extremely difficult," that Dang was "repeatedly confused," and was "unable to focus conversations on the issues that are relevant at the moment." After hearing argument, the circuit court acknowledged its consideration of the "representations made by [defense counsel]," but noted it did not have "any evidence" or "any testimony" before it to find probable cause in light of Dr. Hudacek's report that "goes into great detail as to the defendant's understanding of the proceedings against him and his ability to assist his attorney in his own defense."

On the morning of trial, when counsel requested that the court conduct a colloquy with Dang to inquire into his competency, the circuit court did not dismiss counsel's concerns but granted counsel's request. In fact, seeking direction as to counsel's specific concerns, the circuit court inquired of counsel as to "what questions you want [the court] to ask him," commenting that "[i]t may strike you as obvious, but it doesn't strike me as obvious." After defense counsel supplied the court with suggested questions, the court conducted the colloquy in accord with defense counsel's suggestions.

Furthermore, the concerns advanced by defense counsel at the hearing and trial were the same concerns dating back to previous counsel's representation and were, therefore, present

28

when Dr. Hudacek performed her evaluation.  In Dang's initial motion for a competency evaluation, which was granted, defense counsel asserted that Dang spoke and understood "limited English" and communicated to defense counsel with assistance of an interpreter.  According to the motion, Dang "was unable to express an understanding of important aspects of the proceedings against him and his rights related thereto, notwithstanding defense counsel's efforts to inform him."  Dr. Hudacek's report addressed Dang's tendency to shift focus and give nonresponsive answers, but concluded his behavior was a symptom of situational anxiety not incompetence.

In sum, the record reflects that the circuit court carefully considered the representations made by counsel both at the hearing and at trial.  However, the circuit court also had the benefit of Dr. Hudacek's report addressing the issues of concern to counsel and the opportunity to observe Dang and his interaction with defense counsel.  We cannot conclude that the circuit court committed an abuse of discretion in weighing the significance of these factors.

4.  Timing of Dang's Motion

Finally, Dang argues that the circuit court erred in placing significant weight on the timing of the motion for the second competency evaluation.

At the December 2 hearing, when defense counsel explained that the new information from Mrs. Pham was gained when counsel used an interpreter to speak with her rather than relying on family, the circuit court asked whether an interpreter could have been used earlier.  Specifically, the circuit court stated: "[T]his matter has been continued several times and here we are, literally on the eve of trial – trial is set for Monday – and you're bringing things to my attention that there's just no reason that I can see why they weren't raised in September or October."  Again, the circuit court asked, "If you had problems communicating with your client back in October or September, why were you not back in court then seeking a new competency evaluation? Why now?"  In response to the court's comments, defense counsel explained that while it might have been possible to discover the information earlier, counsel had not, and the information learned from Mrs. Pham indicated potential causes for counsel's concerns regarding Dang's mental health.  This discussion between the circuit court and counsel continued intermittently throughout the hearing.

After defense counsel concluded argument in support of the motion for a second competency evaluation, the circuit court noted that it had "focused considerably on the fact that this is occurring on the eve of trial" and "whether the information that was brought to my attention yesterday could have been available

months ago." Nevertheless, the circuit court acknowledged that defense counsel was "correct that the focus is on <u>whether or not there's probable cause at this time, regardless of whether it could have been produced to the [c]ourt at an earlier point in time</u>."(Emphasis added.) The circuit court then proceeded to discuss the standard set forth in Code § 19.2-169.1 and, in particular, whether there was probable cause to conclude that Dang lacked substantial capacity to understand the proceedings or assist his counsel.

It is clear, then, that while the circuit court was understandably concerned about the timing of the motion and why counsel had not obtained the information at an earlier time if communications had, in fact, been difficult, it was properly focused on the question of Dang's competency as of the date of trial. Furthermore, the circuit court made no comment regarding the timing of the motion when it was renewed at trial. Therefore, we reject Dang's underlying premise that the circuit court placed significant weight on the timing of his motion.

### III.  CONCLUSION

In sum, we conclude the circuit court did not abuse its discretion in finding there was no probable cause to order a second competency evaluation. Accordingly, we will affirm the judgment of the Court of Appeals.

<u>Affirmed.</u>

31

JUSTICE MIMS, dissenting.

The majority determines that the circuit court did not abuse its discretion when it failed to order a second competency evaluation for a defendant with possible organic brain injury who displayed signs of confusion and incoherence at trial.  In my view, that conclusion does not comport with the evidence in the record and the controlling precedent in Drope v. Missouri, 420 U.S. 162 (1975).  I therefore must dissent.

A court is required to order a competency evaluation if it finds "at any time after the attorney for the defendant has been retained or appointed and before the end of trial . . . that there is probable cause to believe that the defendant . . . lacks substantial capacity to understand the proceedings against him or to assist his attorney in his own defense."  Code § 19.2-169.1(A) (emphasis added).[*]

---

[*] The statutory mandate coincides with defendants' Fourteenth Amendment due process rights.  See Medina v. California, 505 U.S. 437, 439 (1992); compare Code § 19.2-169.1(A) with Godinez v. Moran, 509 U.S. 389, 396 (1993) (stating the inquiry for competency "is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as a factual understanding of the proceedings against him.") (internal quotation marks omitted).

We review a trial court's ruling whether such probable cause exists for abuse of discretion. Johnson v. Commonwealth, 53 Va. App. 79, 93, 669 S.E.2d 368, 375 (2008). A court abuses its discretion in three principal ways: "when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment." Lawlor v. Commonwealth, 285 Va. 187, 213, 738 S.E.2d 847, 861 (2013) (quoting Landrum v. Chippenham & Johnston-Willis Hosps., 282 Va. 346, 352, 717 S.E.2d 134, 137 (2011)), cert. denied ___ U.S. ___, 134 S. Ct. 427 (2013).

In Drope, the Supreme Court of the United States set forth the factors relevant to a court's consideration of whether an inquiry into a defendant's competency is necessary. They include "evidence of [his] irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." 420 U.S. at 180. "[E]ven one of these factors standing alone may, in some circumstances, be sufficient." Id. The Court also made clear that when the signs of incompetency manifest themselves is not an appropriate factor for

consideration.  See id. at 181 ("Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.").

The majority determines that the circuit court did not abuse its discretion when it declined to order a second competency evaluation because the report following the first evaluation concluded that Dang was competent.  It holds that a new evaluation was necessary only if there was a substantial change in circumstances after the initial evaluation.  In my view, there was a substantial change in circumstances and the circuit court therefore abused its discretion in its application of the Drope factors.

On the surface, the circuit court's consideration of the report corresponds to the third Drope factor.  However, the value of the report was substantially undermined by the subsequent revelation that Lang had endured physical abuse during childhood, which may have resulted in organic brain injury.  This information was not known at the time of the evaluation.  Thus, the report could not take it into account.  Moreover, the fact that Dang was unable or unwilling to disclose

34

it to the evaluator may itself have been symptomatic of an underlying disorder impacting his competence to stand trial. Similarly, the discovery that Dang had misrepresented his family history and relationships may have been clinically significant.

Courts commonly have no mental health training and consequently are ill-prepared to reach competency conclusions without the assistance of professional mental health clinicians. Code § 19.2-169.1(A) requires a competency evaluation precisely for the purpose of providing such assistance. In sum, we simply do not know the clinical relevance of this new information. However, the record establishes that Dang's possible brain injury and his failure to disclose both it and his true family history and relationships were sufficient to give at least one mental health practitioner pause.

Accordingly, in my view, these new facts amounted to a substantial change in circumstances by calling into question the accuracy of the conclusions in the competency evaluation report. Therefore, the value of the report's conclusions to satisfy the third Drope factor was diminished.

Dang's failure to disclose his possible brain injury and his family history and relationships also may constitute evidence of irrational behavior under the first Drope factor.

35

We again do not know whether the behavior was symptomatic of an underlying disorder and, if so, whether that disorder may have affected his competency to stand trial.

Perhaps most compelling, however, is Dang's behavior during the circuit court's colloquy, which goes to the second Drope factor. As the majority emphasizes, the competency inquiry turns on the defendant's "present ability to consult with his lawyer with a reasonable degree of rational understanding." Godinez v. Moran, 509 U.S. 389, 396 (1993) (emphasis added) (internal quotation marks omitted). Dang's behavior during the colloquy is possibly the best indicator of his "present ability." Yet, in addition to being generally nonresponsive when his answers did not correspond to the court's questions, his answers revealed that he did not understand the charges against him, did not understand the potential sentences that would follow from conviction, did not understand what a prosecutor was, and did not know the names of his attorneys. Dang's failure to understand this information during the colloquy calls into question his competency at that time.

The circuit court and the majority dismiss this behavior as being consistent with the evaluation report's findings. But, again, that report was predicated on incomplete and inaccurate

36

information.  In the absence of professional guidance, neither we nor the circuit court can ascertain whether the report's conclusions would have been the same if the evaluator had known all the relevant facts.  Similarly, we cannot know whether Dang's behavior during the colloquy was consistent with what the report described as anxiety, or whether it was consistent with, for example, an irrational panic or some other underlying mental disturbance which may or may not have affected his legal competence.

In short, the majority considers the first report in isolation, without considering the information Dang failed, for whatever reason, to disclose.  It similarly considers Dang's behavior during the colloquy to be consistent with the flawed report.  But under Drope, neither the report nor Dang's behavior can be considered in isolation.  Rather, the circuit court, and this Court on review, is obligated to consider all the facts to determine whether probable cause existed to justify a second competency evaluation.  In my view, the facts here are sufficient to meet the probable cause standard fixed by Code § 19.2-169.1(A).

Finally, the circuit court was improperly influenced by the fact that the deficiencies in the report were not known until

"the eve of trial."  Although the majority attempts to minimize the effect of this influence, the court itself admitted that it "focused considerably on the fact that this is occurring on the eve of trial . . . and whether the information that was brought to my attention yesterday could have been available months ago." Both Drope and Code § 19.2-169.1(A) make clear that information calling the defendant's competence into question is to be considered without regard to when or how the information is made known to the trial court.  The question was not whether the information could have been presented earlier, or even whether it was withheld for tactical advantage (an assertion made by neither the Commonwealth nor the circuit court).  The defendant's constitutional right to due process and the statutory procedure that safeguards it are preeminent.  Rather, the question is whether the information, whenever made known to the trial court, calls into doubt the defendant's competence at that time.

I therefore must conclude that the circuit court abused its discretion.  It gave improper weight to the flawed competency report, the third Drope factor.  It failed to consider possible evidence of Dang's irrational behavior, namely his failure to disclose possible brain injury and his family history and

38

relationships during the competency evaluation, the first <u>Drope</u> factor.  It failed to consider the possible deficiencies in the competency report when it concluded that Dang's behavior during the colloquy was consistent with the report, the second <u>Drope</u> factor.  It improperly considered the timing of the information raising new questions about Dang's competence.  Accordingly, I must dissent from the majority's opinion affirming its judgment.