COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Beales, Malveaux and Frucci
Argued at Norfolk, Virginia


J.N.W.

MEMORANDUM OPINION* BY
v.        Record No. 0163-25-1          JUDGE STEVEN C. FRUCCI
FEBRUARY 24, 2026

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Salvatore R. Iaquinto, Judge

(Ashton H. Pully Jr.; Counseling & Litigation, P.C., on brief), for
appellant.  Appellant submitting on brief.

Matthew J. Beyrau, Assistant Attorney General (Jason S. Miyares,[1]
Attorney General, on brief), for appellee.


Following a bench trial, the circuit court convicted J.N.W. of unlawful shooting within an

occupied building, involuntary manslaughter, and possession of a firearm by a person under 18

years of age.  On appeal, J.N.W. challenges the circuit court's denial of her motions to suppress

her confession given to Detective Smolin and to determine her competency and its "exclusi[on

of] expert testimony regarding the effects of hydroxyzine on [her] cognitive state."  For the

following reasons, we affirm the circuit court's judgment.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

BACKGROUND[2]

In August 2023, J.N.W.[3] and her friend took an Uber to an apartment complex. They met two boys there, N.T. and Z.S., and together the group went into an unlocked, vacant apartment.[4] They sat down and began to "liste[n] to music" and "chil[l]." N.T. showed the others a handgun he brought. N.T. gave the handgun to J.N.W. J.N.W. "wav[ed] it around," acting "cute."[5] While doing so, the handgun went "off," and the bullet struck Z.S. in the head.

After firing it, J.N.W. dropped the handgun on the floor. J.N.W.'s friend told J.N.W. to leave, so she walked to a nearby CVS and sat down on a chair by the photo-development section. There, J.N.W. called her mother and told her that she "accidentally shot the boy."

Once J.N.W. left the apartment, her friend called 911. Officer Mones of the Virginia Beach Police Department responded to the scene and found Z.S. on the floor, unresponsive. Z.S. died eighteen days later, after being declared brain dead and being removed from life support. His manner of death was determined to be a homicide and his cause of death was a gunshot wound to the head.

---

[2] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). In doing so, we discard any evidence that conflicts with the Commonwealth's evidence, and regard as true all the credible evidence favorable to the Commonwealth and all inferences that can be fairly drawn from that evidence. *Cady*, 300 Va. at 329.

Portions of the record in this case are sealed. "To the extent that certain facts mentioned in this opinion are found in the sealed portions of the record, we unseal only those portions." *Herbert v. Joubert*, 83 Va. App. 592, 604 n.1 (2025) (quoting *Chaphe v. Skeens*, 80 Va. App. 556, 559 n.2 (2024)).

[3] J.N.W. was fifteen years old at the time. We use initials, rather than names, to protect the privacy of the minor.

[4] At the time, Z.S. was twelve years old and N.T. was a teenager. We use initials, rather than names, to protect the privacy of the minor witnesses and victim mentioned throughout the opinion.

[5] J.N.W. referred to her actions as acting "cute."

- 2 -

After receiving a call that there "was a witness at the CVS," Detectives Hile and Crawford of the Virginia Beach Police Department went to the CVS and found J.N.W.  J.N.W. was "upset" and "emotional."  J.N.W. told Detective Hile that she had been at the apartment with her friend and the boys, that "[t]hey began to play with a gun," and that while "pass[ing] it around," the handgun "went off, striking [Z.S.] in the head."  The detective gave J.N.W. some water, and J.N.W. called her mother again.  While on speakerphone, J.N.W.'s mother told her she was on her way and "not to say anything."  J.N.W. began to "panic" and hyperventilate, so the detectives called an ambulance.  While they waited for J.N.W.'s mother and the ambulance to arrive, the detectives and J.N.W. sat on the hood of the detectives' vehicle.[6]  J.N.W. and her mother rode together in the ambulance, and the detectives followed behind in their vehicle.

At the hospital, J.N.W. began to calm down.[7]  After her mother requested that J.N.W. not be given anything that would cause her to be drowsy and unable to answer any questions the detectives had, J.N.W. was given medication.[8]  Afterwards, Detective Crawford was informed that developments in the investigation of the shooting led to J.N.W. being identified as the primary suspect.  Detective Crawford then told J.N.W. and her mother that J.N.W. was "required to go down to the detective bureau" and that an officer was coming to escort her.

J.N.W. was subsequently transported to the bureau and placed into an interview room.  Detective Smolin of the Virginia Beach Police Department conducted the interview.[9]  At the

---

[6] J.N.W. was not handcuffed at the time.

[7] J.N.W. was not handcuffed at the time.

[8] At pre-trial hearings, it was proffered that the medication was Atarax, which is the brand name for hydroxyzine.

[9] The interview was recorded as a video.  Since conducting the interview, Detective Smolin was promoted to sergeant.  As such, at points in the record he is referred to as Sergeant Smolin.  We will refer to him as Detective Smolin throughout this opinion.

beginning of the interview, Detective Smolin determined J.N.W.'s age and address. Next, Detective Smolin told J.N.W. that he had to "read [her] rights." Detective Smolin subsequently began to read the *Miranda*[10] warnings to J.N.W. from a preprinted card. After he advised her that she had "the right to talk to a lawyer and have [one] present with [her] while [she was] being questioned," J.N.W. interrupted to ask: "I can do it right now?" Detective Smolin replied with "[that]'s a perfectly valid question" and further stated: "So, you're entitled to legal representation. That's what that means." J.N.W. then asked if her mother could be present, and Detective Smolin first said "no" but then clarified that she could be if she was a lawyer. Detective Smolin further stated:

> So generally, what happens is, is retaining a lawyer is a process.
> We're not gonna call a lawyer and like have a guy just—they're not
> gonna–you know it's Sunday. They're, they're in their pool right
> now with their kids and barbecuing out back. They're not gonna
> jump down here and just come in here with somebody that they don't
> know. And they don't know if you can pay them, right. 'Cause
> they're all about the money.

After, J.N.W. said: "Oh, yeah. No, I do not have no money." Detective Smolin then reiterated that J.N.W. "was entitled to representation." He said: "If you don't want to talk to me at all . . . and you would rather have a lawyer, then I won't talk to you, and we'll do what we gotta do, and if you need a lawyer, you get a lawyer." Detective Smolin then started over and read the *Miranda* warnings to J.N.W. from the beginning, which included telling her that if she could not "afford to hire a lawyer, one [would] be appointed to represent [her] before any questioning if [she] wish[ed]." After, J.N.W. stated she understood her rights.

Detective Smolin then asked J.N.W. about the shooting incident at the apartment. J.N.W. told him that N.T. gave her the gun and that she was just "waving it around," acting "cute." She said that she "accidentally shot the boy." According to her, they had not been drinking alcohol or using drugs, and she had thought that the safety was on.

---

[10] *Miranda v. Arizona*, 384 U.S. 436 (1966).

- 4 -

Later, J.N.W. was charged with unlawfully shooting within an occupied building, involuntary manslaughter, and possession of a firearm by a person under 18 years of age.

## I. Motions to Suppress

In March 2024, J.N.W. moved to suppress "the statements of [J.N.W.] wherein the Police Officers failed to properly advise [J.N.W.] of her 5th Amendment right regarding self-incrimination when first detained and further abide by her request to have a lawyer present." J.N.W. also stated that "the age and mental capacity of [J.N.W.] was not addressed by the investigating Officer." At a hearing on the motion, J.N.W. argued that her age and lack of criminal history prevented her from being able to waive her *Miranda* rights and that her mother should have been present for the questioning. J.N.W. also argued that Detective Smolin's statements about when a lawyer could arrive were inappropriate and that he should have "addressed" J.N.W.'s "age and mental capacity." After reviewing a video of J.N.W.'s interview with Detective Smolin, the circuit court found, in part, that J.N.W. was "extremely articulate, mature, extremely responsive to the questions that the officer was asking, . . . appeared intelligent, . . . [and] conversed with the officers with no problems." The circuit court also found that J.N.W. "had the mental capacity to understand the *Miranda* warning." The circuit court denied the motion.

In May 2024, J.N.W. filed a motion to reconsider, arguing that J.N.W. was questioned without "being advised of her Fifth Amendment rights," without being provided with a lawyer after requesting one, without the presence of her mother, without properly waiving her *Miranda* rights, and while under the influence of "the medication Atarax (hydroxyzine)." In June 2024, J.N.W. filed a second motion to suppress, arguing that J.N.W.'s *Miranda* rights waiver was not voluntary due to her being under the influence of "a psychotropic drug, Atarax (hydroxyzine)." Emphasizing that there were "no indications of impairment at all," the circuit court denied both motions.

II.  Motion for Competency Evaluation

In May 2024, J.N.W.'s counsel moved for J.N.W. to be evaluated for competency.  In the filed motion, defense counsel asserted that J.N.W. "recently" "suffered significant impact to the back of the head" and was "prescribed medication which may be psychotropic in nature at an early age."  At a hearing on the motion, defense counsel asserted that "the motion for competency was based on the fact that a recent CLE with the appellate judges–one of them who used to be a public defender–commented that whenever you're representing a juvenile, the competency isn't just one time."  Later in the hearing, it was mentioned that J.N.W. had "banged her head" at some point since the date of offense.  J.N.W.'s guardian ad litem also said that J.N.W. had expressed suicidal ideations and an evaluation "might" be needed.[11]  J.N.W. did not present any evidence, nor did her counsel proffer any additional information, about her ability to understand the proceedings or assist with her defense.

With the agreement of both parties, the circuit court conducted a "voir dire" of J.N.W. "about competency," asking her questions about the judicial process and courtroom proceedings of her case.  J.N.W. was able to answer questions asked of her and stated that she "underst[ood] what happened" that day.  During the questioning, her defense counsel stated that there was "nothing" at "this juncture" that he believed J.N.W. could not assist with.  Finding a competency to stand trial evaluation unnecessary, the circuit court denied the motion at that time.

III.  Motion to Appoint an Expert Witness

In May 2024, J.N.W. moved "to engage expert witness."  In the written motion, J.N.W. asserted that her "ability to knowingly and willingly waive her Miranda Rights was impaired by the psychotropic medication."  However, the written motion did not name an expert witness nor specify

---

[11] In part due to J.N.W.'s age and her mother's "transportation issues," a guardian ad litem was appointed for J.N.W. in May of 2024.

what opinion would be given or sought, rather it only requested the appointment of an expert witness to testify about the effects of "Atarax (generic name: Hydroxyzine)." The written motion did state that "[t]he medication in question is a prescription anxiolytic drug, which causes, among other things, brain fog, drowsiness, and impaired cognitive function" that "is recommended to be prescribed with caution when being administered to adolescents."

At a hearing on the motion, J.N.W.'s counsel claimed that he filed the motion after seeing "information that [he] had gleaned from the internet as far as hydroxyzine is concerned." Defense counsel further stated that "it's [his] concern that that had a bearing on her ability to properly waive her Miranda rights with the detective," so he thought "it should be addressed by expert testimony." Though at the hearing he gave a name of an expert and said the expert told him a fee, defense counsel did not proffer to the circuit court what the expert's opinion would be or its necessity to J.N.W.'s defense. The circuit court denied the motion.

After a bench trial, J.N.W. was convicted of unlawfully shooting within an occupied building, involuntary manslaughter, and possession of a firearm by a person under 18 years of age. J.N.W. appeals.

ANALYSIS

I. Motion to Suppress

"The law regarding appellate review of a trial court's decision on a motion to suppress is well settled. The appellant bears the burden of establishing that reversible error occurred." *Williams v. Commonwealth*, 71 Va. App. 462, 474 (2020). J.N.W. contends that she invoked her right to counsel. She also claims that any waiver of her *Miranda* rights was not knowingly, intelligently, and voluntarily made, primarily due to "her mother's absence during the critical moments of custodial interrogation" and "Detective Smolin's misleading statements regarding the availability of legal counsel."

- 7 -

A. Invocation of Right to Counsel

The right to the presence and assistance of counsel is one of the rights that a police officer must inform a suspect in custody prior to interrogating them. *Commonwealth v. Hilliard*, 270 Va. 42, 49 (2005). "If the suspect waives [her] . . . righ[t], the police are free to begin questioning [her]; however, if the suspect changes [her] mind during the interrogation and requests the assistance of counsel, the interrogation must cease until an attorney has been made available to the suspect or the suspect reinitiates the interrogation." *Id.*

In order to invoke the right to counsel, a suspect must do so unambiguously and unequivocally. *See Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010). "Not all statements mentioning a lawyer are an effective request for the presence of counsel[; a] suspect 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" *Burrell v. Commonwealth*, 58 Va. App. 417, 429 (2011) (citation omitted) (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)). The subjective understanding of the officer and goal of the suspect are irrelevant, as "the determination whether an accused actually invoked his right to counsel is a purely objective inquiry." *Hilliard*, 270 Va. at 50. If the reference to an attorney is one that a reasonable officer in light of the circumstances may only have understood that the suspect might be invoking his right to counsel, police questioning may continue. *See Davis*, 512 U.S. 452. It is only when a suspect has clearly asserted his right to counsel that the right is effectively invoked and questioning must cease. *See id.*[12]

---

[12] For this reason, the Supreme Court of the United States has held that a statement such as, "maybe I should talk to a lawyer," was not an invocation of the right to counsel. *See Davis*, 512 U.S. 452 (declining to adopt a rule requiring officers to ask clarifying questions and finding that if the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him). Additionally, the Supreme Court of Virginia has found statements such as, "can I speak to my lawyer" and "I'll be honest with you, I'm scared to say anything without talking to a lawyer," to be ambiguous and not effectively

The issue of whether a criminal suspect invoked his right to counsel is one of a mixed question of law and fact, which requires the application of these constitutional standards to the facts of a given case. *Redmond v. Commonwealth*, 264 Va. 321, 326 (2002). "When an appellate court conducts its independent review of a circuit court's determination of this issue, the appellate court may review the circuit court's findings of historical fact only for clear error and must give deference to the inferences that may be drawn from those factual findings." *Hilliard*, 270 Va. at 49-50.

Here, after being told that she had "the right to talk to a lawyer and have [one] present with [her] while [she was] being questioned," J.N.W. asked: "I can do it right now?" Detective Smolin replied with "[that]'s a perfectly valid question" and further stated: "So, you're entitled to legal representation. That's what that means." He then continued to inform her of her rights, after which she stated she understood her rights and willingly answered the questions asked. "At most, [J.N.W.'s question] sought to clarify one of the rights of which [she] had already been advised." *Poyner v. Commonwealth*, 229 Va. 401, 410 (1985). It "was neither a request for counsel nor a statement of unwillingness to proceed without counsel." *Bolding v. Commonwealth*, 15 Va. App. 320, 323 (1992). Therefore, the circuit court did not err in finding that J.N.W. did not invoke her right to counsel.

B. Knowing, Intelligent, and Voluntary Waiver

As articulated by the Supreme Court of the United States in *Miranda v. Arizona*, 384 U.S. 436, 469-73 (1966), before interrogating a suspect who is in police custody, law enforcement officers must inform the suspect of certain rights. A suspect can waive these rights "if the waiver is made knowingly and intelligently." *Angel v. Commonwealth*, 281 Va. 248, 257 (2011). "The

---

invoking the right to counsel. *See Redmond v. Commonwealth*, 264 Va. 321 (2002); *Midkiff v. Commonwealth*, 250 Va. 262 (1995).

determination of whether the waiver was made knowingly and intelligently is a question of fact that will not be set aside on appeal unless plainly wrong." *Id.* at 258. On the other hand, whether a statement was voluntary is a "legal rather than factual question." *Gray v. Commonwealth*, 233 Va. 313, 324 (1987) (citations omitted).

> Thus, whether a waiver of *Miranda* was "made voluntarily, knowingly, and intelligently" has two components: "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."

*Tirado v. Commonwealth*, 296 Va. 15, 28 (2018) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). "The 'test to be applied in determining voluntariness is whether the statement is the product of an essentially free and unconstrained choice by its maker, or whether the maker's will has been overborne and his capacity for self-determination critically impaired.'" *Id.* (quoting *Gray*, 233 Va. at 324). "In determining whether a defendant's will has been overborne, courts look to the totality of all the surrounding circumstances." *Id.* "Where a juvenile is involved, 'this includes evaluation of the juvenile's age, experience, education, background, and intelligence, and whether [she] has the capacity to understand the warnings given [to her], the nature of [her] Fifth Amendment rights, and the consequences of waiving those rights." *Potts v. Commonwealth*, 35 Va. App. 485, 495 (2001) (quoting *Fare v. Michael C.*, 442 U.S. 707, 717 (1979)).

In reviewing the totality of the circumstances, the circuit court's ruling that J.N.W.'s waiver was knowingly and intelligently made is supported by the evidence. While J.N.W. was fifteen years old, she appeared intelligent and articulate and said she understood her rights. The

evidence supports the circuit court's finding that she did not show "indications of impairment."[13] "Although 'it is desirable to have a parent, counsel or some other interested adult or guardian present when . . . a juvenile waives fundamental constitutional rights and confesses to a serious crime . . . , the mere absence of a parent or counsel does not render the waiver invalid." *Potts*, 35 Va. App. at 496 (alterations in original) (quoting *Grogg v. Commonwealth*, 6 Va. App. 598, 613 (1988)).

As for whether the statement was voluntary, even assuming without deciding that it was an error to admit the statements J.N.W. made at the bureau to Detective Smolin because of Detective Smolin's comments about the availability of a lawyer, any error was harmless. "An erroneous evidentiary ruling does not require reversal of a criminal conviction where the error is harmless." *Dean v. Commonwealth*, 30 Va. App. 49, 54 (1999) (quoting *Brown v. Commonwealth*, 25 Va. App. 171, 182 (1997) (en banc)). In cases such as this where the error would be constitutional in nature, this Court determines if it is clear beyond a reasonable doubt that a rational trier of fact would have found the defendant guilty absent the error. *See Commonwealth v. White*, 293 Va. 411, 420-21 (2017). Under this standard, it is not "presume[d] that an error cannot be harmless if the factfinder considered erroneously admitted evidence." *Id.* at 421. "Rather, we must determine whether it is 'clear beyond a reasonable doubt that a rational [factfinder] would have found the defendant guilty absent the error.'" *Commonwealth v. Paxton*, 304 Va. 298, 305 (2025) (alteration in original) (quoting *White*, 293 Va. at 422).

> In making that determination, the reviewing court is to consider a host of factors, including the importance of the tainted evidence in the prosecution's case, whether that evidence was cumulative, the presence or absence of evidence corroborating or contradicting the

---

[13] Though defense counsel continuously proffered that J.N.W. was given a medication that may cause drowsiness, no evidence that J.N.W. had any side effects from the medication was given, and the circuit court did not find any signs of impairment.

tainted evidence on material points, and the overall strength of the prosecution's case.

*Id.* at 305-06 (quoting *Lilly v. Commonwealth*, 258 Va. 548, 551 (1999)).

Here, the circuit court convicted J.N.W. of unlawfully shooting within an occupied building, involuntary manslaughter, and possession of a firearm by a person under 18 years of age. Beyond the statements made by J.N.W. to Detective Smolin, the prosecution's case included: (1) a stipulation that Z.S. died from a gunshot wound to the head; (2) testimony that Z.S. and others occupied a building when he was shot; (3) statements from J.N.W. made to Detective Hile outside CVS that she had been at the apartment with her friend and the boys, that "[t]hey began to play with a gun," and that while "pass[ing] it around," the handgun "went off, striking [Z.S.] in the head"; and (4) testimony from J.N.W.'s friend that detailed the events of the shooting, including that J.N.W. had the handgun in her hands when it went off and shot Z.S. This was strong, independent evidence of J.N.W.'s guilt and corroborated the material points, and at times was cumulative, of the statements made by J.N.W. to Detective Smolin. As far as how important J.N.W.'s statements to Detective Smolin were for the prosecution's case, we note that when making its ruling, the circuit court referred to the video of the statements but stated that "[r]egardless of whether you see the video or not, actually, there is evidence from the witness of what happened, the witness who was there." After making this statement, the circuit court found J.N.W. guilty of the three charges. Accordingly, any error in admitting the statements J.N.W. made to Detective Smolin was harmless beyond a reasonable doubt.

II. Competency Evaluation

J.N.W. also assigns error to the circuit court's denial of her motion to evaluate her competency. "A defendant is competent to stand trial when he has the present ability to understand the proceedings against him and consult with his lawyer with a reasonable degree of understanding." *Clark v. Commonwealth*, 73 Va. App. 695, 704-05 (2021). Code

§ 19.2-169.1(A) requires a court to order a competency evaluation if there is "probable cause to believe" the defendant "lacks substantial capacity to understand the proceedings against him or to assist his attorney in his own defense." "Because a trial court is in the best position to weigh the evidence presented on a defendant's competency, we will reverse a trial court's decision denying a competency evaluation under Code § 19.2-169.1(A) only if the trial court abused its discretion." *Clark*, 73 Va. App. at 705. "A trial court abuses its discretion when it (1) does not consider a 'relevant factor' that should have been given 'significant weight,' (2) considers an 'irrelevant or improper factor' and gives it significant weight, or (3) considers all relevant factors but makes a 'clear error of judgment' in weighing the factors." *Id.* (quoting *Dang v. Commonwealth*, 287 Va. 132, 146 (2014)).

"[P]robable cause warranting a competency evaluation depends on 'probabilities that are based upon the factual and practical considerations in everyday life as perceived by reasonable and prudent persons.'" *Id.* at 707 (quoting *Johnson v. Commonwealth*, 53 Va. App. 79, 93 (2008)). "While one factor standing alone may be sufficient for probable cause, a judge most often evaluates several relevant factors to determine if [a competency] evaluation is warranted under the circumstances." *Id.* at 708. Defense counsel's opinion of a client's competency is a "persuasive factor" which a court "should 'strongly consider'" because counsel "is in the best position to speak to a client's ability to understand proceedings and assist counsel at trial." *Id.* (quoting *Johnson*, 53 Va. App. at 94). Therefore, "courts have found counsel's detailed proffer about a client's mental state sufficient to satisfy the probable cause standard." *Id.* However, "while persuasive, counsel's assertions, 'standing alone, do not typically provide probable cause for an evaluation.'" *Id.* (quoting *Johnson*, 53 Va. App. at 94). "[C]ounsel's 'general impression' of a client's incompetence or testimony about limited instances of a client's irrational behavior

- 13 -

alone does not establish sufficient doubt" in competency. *Id.* (quoting *Johnson*, 53 Va. App. at 95).

Here, notwithstanding J.N.W.'s counsel's requests for J.N.W. to be evaluated, the circuit court had insufficient evidence to establish probable cause that J.N.W. "lack[ed] substantial capacity to understand the proceedings against [her] or assist [her] attorney in [her] own defense."[14] Code § 19.2-169.1(A). At the time of the motion, J.N.W. was able to intelligently answer questions asked of her and stated that she "underst[ood] what happened" that day. Her defense counsel even opined that there was "nothing" at "this juncture" that he believed J.N.W. couldn't assist with. Viewing the circumstances in their entirety, the circuit court did not abuse its discretion by denying the request for a competency evaluation.[15]

III. Expert Testimony

J.N.W. also argues that the circuit court erred in "excluding expert testimony regarding the effects of hydroxyzine on [her] cognitive state" by denying her motion "to engage expert." "[T]he Due Process and Equal Protection clauses [of the United States Constitution] require the appointment of . . . expert[ witnesses] to indigent defendants" if "the defendants ma[ke] a particularized showing of the need for the assistance of such experts." *Husske v. Commonwealth*, 252 Va. 203, 211 (1996). "[W]hether a defendant has made the required

---

[14] While in the filed motion, defense counsel asserted that J.N.W. had an impact to the back of her head and was prescribed medication that "may" have certain side effects, J.N.W. never actually presented evidence about side effects or her ability to understand the proceedings or assist with her defense.

[15] On brief, J.N.W. at times refers to whether she was competent to "waive her Miranda rights and provide voluntary statements," and at other times, she appears to refer to whether she was competent to stand trial. J.N.W.'s motion to evaluate her competency was made to address her competency to stand trial. Therefore, the circuit court only addressed whether she was competent to stand trial at the time. As such, any other argument made on appeal that the circuit court erred in ruling on the motion to evaluate competency is procedurally defaulted under Rule 5A:18.

showing of particularized need is a determination that lies within the sound discretion of the trial court." *Johnson v. Commonwealth*, 292 Va. 772, 778 (2016) (quoting *Commonwealth v. Sanchez*, 268 Va. 161, 165 (2004)). "A particularized need is more than a 'mere hope' that favorable evidence can be obtained through the services of an expert." *Id.* (quoting *Green v. Commonwealth*, 266 Va. 81, 92 (2003)).

Here, J.N.W. failed to demonstrate a particularized need for expert assistance. At the hearing on the motion to "engage expert witness," J.N.W.'s counsel claimed that he filed the motion after seeing "information that [he] had gleaned from the internet as far as hydroxyzine is concerned." Defense counsel further stated that "it's [his] concern that that had a bearing on her ability to properly waive her Miranda rights with the detective," so he thought "it should be addressed by expert testimony." Though he gave a name of an expert and said the expert told him a fee, defense counsel never proffered to the circuit court what the expert's opinion would be or its necessity to J.N.W.'s defense.[16] Further, the circuit court was not given any particularized statements that indicated anything more than J.N.W.'s "hope or suspicion" regarding favorable evidence to her. *See Sanchez*, 268 Va. at 166. "As a result, the [circuit] court was left only to guess whether the unknown, unexplained potential testimony of [J.N.W.'s] expert would be a significant or material factor in [her] defense and, consequently, whether the lack of that testimony would prejudice" her. *Id.* Accordingly, the circuit court did not err when it denied her motion to engage an expert.[17]

---

[16] Even in her filed written motion, all that was communicated to the circuit court in relation to an opinion was that a "medical doctor" was "expected to testify to the effects of certain psychotropic drugs administered to [J.N.W.], specifically the anxiolytic drug, Atarax."

[17] In her final assignment of error, J.N.W. contends that the circuit court's "cumulative errors violated [her] due process rights." However, for the reasons stated above, we have affirmed the circuit court on all other assignments of error. Consequently, we also do not disturb the judgment of the circuit court on this final assignment of error. *See Prieto v. Warden of the Sussex I State Prison*, 286 Va. 99, 117 (2013) ("Having rejected each of petitioner's individual

CONCLUSION

For the foregoing reasons, this Court affirms the circuit court's judgment.

*Affirmed.*



claims, there is no support for the proposition that such actions when considered collectively have deprived petitioner of his constitutional right." (quoting *Lenz v. Warden*, 267 Va. 318, 340 (2004))).